(Nos. 45359, 45589 cons.—

THE PEOPLE *ex rel.* WILLIAM J. SCOTT, Attorney General, *et al.,* Appellants, v. CHICAGO THOROUGHBRED ENTERPRISES, INC., Appellee.

*Opinion filed Nov. 20, 1973.—Rehearing denied Jan. 29, 1974.*

GOLDENHERSH, J., took no part.

William J. Scott, Attorney General, of Springfield (Herbert L. Caplan, Assistant Attorney General, of counsel), for appellants.

William J. Harte and Kevin M. Forde, of Chicago, for appellee.

MR. JUSTICE WARD delivered the opinion of the court:

The common issue in these two appeals, which were consolidated for argument and decision, is the proper measure of the tax imposed by section 10a of the Illinois Horse Racing Act (Ill. Rev. Stat. 1971, ch. 8, par. 37j1) upon Chicago Thoroughbred Enterprises, Inc., on moneys wagered at horse races conducted by it during the years 1966 through 1972. Chicago Thoroughbred Enterprises, Inc., is the defendant-appellee in No. 45359 and is the plaintiff-appellee in No. 45589. The Illinois Racing Board, though a party only to No. 45589, is involved in the subject matter of No. 45359. We shall, for brevity, refer to Chicago Thoroughbred Enterprises, Inc., as "C.T.E." and to the Illinois Racing Board as "the Board", while referring to the plaintiff in No. 45359 as "the State".

The appeal in No. 45359 is from a judgment entered upon a complaint filed by the State in the circuit court of Cook County on February 18, 1972, seeking to recover from C.T.E. amounts claimed to be due as the result of alleged underpayment of the tax on horse races conducted at Arlington Park Race Track for each of the years from

1966 to 1971, inclusive. On July 28, 1972, the circuit court entered judgment in favor of C.T.E. An appeal by the State to the Appellate Court for the First District was transferred here under Rule 302(b). 50 Ill.2d R. 302(b).

The appeal in No. 45589 is from a decree entered upon a complaint for injunction filed in the circuit court of Cook County by C.T.E. on July 31, 1972, against the Board. This case involves horse races conducted by C.T.E. at Arlington Park Race Track during the year 1972. The complaint alleged that the Board intended to collect the privilege tax at a higher rate than that authorized under section 10a of the Act. C.T.E. paid that portion of the tax which it conceded to be due, and deposited the balance (amounting to $642,968) into a protest fund, pursuant to the provisions of sections 2a and 2a.1 of the act of 1911 in relation to the payment and disposition of moneys received for or on behalf of the State (Ill Rev. Stat. 1971, ch. 127, pars. 172, 172a). The case was heard by the same judge who heard the case which is on appeal in No. 45359. A decree was entered on October 6, 1972, ordering that the amount being held in the protest fund be returned to C.T.E. The Board has appealed from that decree, and C.T.E. has taken a cross appeal from that portion of the decree which held that C.T.E. was not entitled to be paid interest on the amount refunded to it. The appeal and cross appeal in No. 45589 were also brought here pursuant to Rule 302(b).

We consider first the appeal in No. 45359. C.T.E. is a Delaware corporation which during the years in question has owned two horse-racing tracks in Illinois. One is Arlington Park Race Track, located in Arlington Heights, in Cook County, and the other is Washington Park Race Track, located in Homewood, also in Cook County. C.T.E. maintains two operating divisions, called the Arlington Park Jockey Club and the Washington Park Jockey Club. Prior to 1961 there existed two Illinois corporations bearing those names, but in that year each of them was

merged into C.T.E., and they thereby ceased to be independent legal entities.

In each of the years from 1966 through 1971 the following procedure took place with respect to C.T.E.: An application was filed with the Board under the name of the Arlington Park Jockey Club division for a license to conduct horse races at Arlington Park Race Track and for an allotment of racing dates at that track. A separate application for a license to conduct races at Washington Park Race Track and for an allotment of racing dates at that track was filed in the name of the Washington Park Jockey Club division. Each of these applications was granted. In addition, at the request of C.T.E., the Board transferred the races set for Washington Park to Arlington Park, and all of the C.T.E. races were run at the latter track. Counsel for C.T.E. stated that the reason for requesting the transfer was that Arlington Park has a larger capacity. We may add that it appears that the Board was fully aware that the two jockey clubs were simply divisions of C.T.E.

Since 1965 the tax imposed by section 10a has been constructed on a graduated scale dependent upon the amount of money wagered. When first instituted, the tax ranged from a minimum of 5% on the first $5,000,000 wagered to a maximum of 8½% on amounts over $60,000,000. (Laws 1965, p. 1647, sec. 1.) In 1969 the rate in each of the six brackets was raised by ¾%, so that the minimum and maximum became 5¾% and 9¼% respectively. Laws 1969, p. 824, sec. 1.

For each of the years in question C.T.E. paid an amount in taxes which was arrived at by calculating separately the tax due on the amount wagered at the races conducted pursuant to the license applied for in the name of its Arlington Park Jockey Club division and the tax due on the amount wagered at the races conducted under the license applied for in the name of the Washington Park Jockey Club division, and by adding these two figures

together to arrive at the total tax. It is the State's position that the tax should have been figured on the combined dollar amount wagered at the races conducted under both licenses.

Because the tax is graduated, the difference between the taxes which were actually paid and those which the State contends should have been paid is substantial. In 1966, for example, the sum wagered in the races conducted pursuant to the license granted to the Arlington Park Jockey Club division was $53,951,941, while the sum wagered in the races held pursuant to the license applied for in the name of the Washington Park Jockey Club division was $47,062,545. If calculated separately, the taxes due on these amounts were $3,816,155 and $3,265,004, respectively, yielding a total tax of $7,081,159. If the tax is computed upon the total amount wagered of $101,014,486, it comes to $7,786,231. Thus for 1966 the differences between the amount of tax which was paid and the amount which the State maintains should have been paid is $705,072. For the total period involved, the amount of tax alleged to be due and unpaid is $4,203,560. In addition, the State sought recovery of interest at 6% per annum on the amount of tax unpaid for each year running from the year in which the tax became due. With this addition the total recovery sought was $4,937,687. C.T.E. does not challenge the State's right to recover interest on whatever taxes may have been unpaid.

We set out below the pertinent portions of section 10a as it read before its amendment in 1969:

"In addition to the license fee herein provided for, a tax upon the total of all moneys wagered each day of a racing meet is hereby imposed upon every person, association, corporation or trust for the privilege of conducting horse racing meetings other than charity meets under the provisions of this Act, at the following rates at any race track or enclosure located within a county of 500,000 or more population or within a county of less than 500,000 population but within 100 miles of

the corporate limits of any city in this State having a population of 1,000,000 or more:

Upon the first $5,000,000 of annual pari-mutuel handle ...................................... 5%
$5,000,001 to $10,000,000 ..................... 6%
$10,000,001 to $30,000,000 ................... 7%
$30,000,001 to $40,000,000 ..................7½%
$40,000,001 to $60,000,000 ................... 8%
Over $60,000,000 in annual pari-mutuel handle .... 8½%

At any race track or enclosure located within a county of less than 500,000 population and more than 100 miles from the corporate limits of any city in this State having a population of 1,000,000 or more the following tax rates shall be imposed, except upon charity meets:

Upon the first $10,000,000 of annual pari-mutuel handle ...................................... 5%
$10,000,001 to $20,000,000 ................... 6%
$20,000,001 to $30,000,000 ................... 7%
$30,000,001 to $40,000,000 ..................7½%
$40,000,001 to $60,000,000 ................... 8%
Over $60,000,000 in annual pari-mutuel handle .... 8½%

A tax of 7% of the total of all money wagered each day of a charity racing meet is imposed on every person, association, corporation or trust conducting such meet." Ill. Rev. Stat. 1967, ch. 8, par. 37j1.

As previously mentioned, during 1969 the tax rate for each bracket was increased by ¾%. The term "pari-mutuel handle" appearing in the foregoing schedule means the amount wagered.

Prior to its amendment in 1965, section 10a used a different method for determining the amount of the tax. A flat tax of 4% was imposed on "the total of all moneys wagered each day of a racing meet" plus a surtax of 2% if the daily total exceeded $300,000. (Ill. Rev. Stat. 1963, ch. 8, par. 37j1.) As illustrated by C.T.E.'s own situation, the 1965 amendment had the effect of increasing tax revenues. For example, the total "handle" for the 67 racing days allotted to C.T.E. in 1966 was approximately $100,000,000. Under the maximum rate allowed under the old law a tax of $6,000,000 would have been due.

That figure may be compared with the approximately $7,100,000 which was due under the new schedule as calculated by C.T.E. and the $7,787,000 figure which the State claims was due.

C.T.E. does not directly contend that the licenses issued to its two divisions should be treated as if the divisions constituted two independent applicants. C.T.E. seeks to achieve the same result, however, by arguing that for each year in question there were two licensed meetings at Arlington Park, and that the tax is to be computed on the basis of considering each meeting separately.

The initial difficulty with this reading of the section is that it deprives the term "annual" of any significance. C.T.E. insists that the function of the quoted term is simply to make clear that the tax is to be calculated on a cumulative total rather than on the amount wagered each day, as had been done prior to the 1965 amendment, but that the period over which the cumulation is to be made is a racing meeting, not the entire season. We cannot agree. Under the former law it was largely immaterial whether the tax was computed on a daily basis or on the total for the meeting, since the base tax was not graduated in the manner now provided. The introduction of the graduated scale itself disclosed an intent to depart from a day-by-day basis, and the term used in the Act to describe the period over which the tax is to be cumulated is "annual", not per meeting.

A second consideration arises from the specific rates of tax employed. As we recently observed in *People ex rel. Scott v. Illinois Racing Board, 54 Ill.2d 569, 576,* "A primary legislative purpose in the regulation of horse racing is the generation of income for the State." The figures appearing in the record show that in none of the years in question did the total amount of money wagered at either of the two C.T.E. meetings, considered separately, exceed $60,000,000. The highest figure reached for the Arlington Park Jockey Club division races was slightly

under $56,000,000, which was reached in 1967. As for the Washington Park Jockey Club division, the highest figure was approximately $52,784,000, which was reached in 1971. Comparable division figures for other years ran as low as $41,000,000 and $45,000,000. The consequence of adopting C.T.E.'s theory would be to render the maximum rate prescribed under section 10a inoperative as to C.T.E., and also to reduce the taxable amounts falling within the lesser brackets. It would appear, moreover, that there might be no racing association whatever subjected to the maximum rate. The record does not contain breakdowns for other associations, but the State asserts, and C.T.E. does not specifically deny, that the annual pari-mutuel handle of C.T.E. substantially exceeds that of other associations, even on C.T.E.'s own method of calculation. It is obvious from the Horse Racing Act that the legislature has studied questions directly or indirectly related to horse racing. It is not unreasonable to conclude that when the legislature enacted section 10a it had considered there would be operations which would be subject to the maximum rate.

Still a further objection to C.T.E.'s reading of the Act is one which arises out of the provisions of sections 2 and 3 of the Act relating to licenses and allotments of racing dates. (Ill. Rev. Stat. 1971, ch. 8, pars. 37b, 37c.) The basic structure of these sections ties racing licenses to control of a racetrack. Only a person owning or leasing a track is eligible for a license. The same person may own and operate more than one track, and may apply for more than one license, but there must be a separate license for each track, whose location must be specified in the license, and the license is not to apply to any other track,

While each license must specify the dates on which the racing meets are proposed to be held, section 2 also states, "An applicant may make any number of applications for horse racing meetings ***." Assuming that this provision permits a person to hold two separate meetings at a single

track, the State points out that the way would be opened for a track operator to reduce his pari-mutuel tax through the device of applying for multiple licenses each covering a shorter period of time than the maximum number of racing dates which the Act permits to be allotted to any single track.

That precise situation is not presented here, since C.T.E. filed two separate applications, one for a meeting to be held at Washington Park and the other for a meeting to be held at Arlington Park. A provision of section 3, however, authorizes the Board to "permit all or a portion of the allotment of racing days allotted to a race track to be run at another race track or tracks located within 75 miles of the race track for which the dates allotted to the race track or race tracks at which such dates are permitted to be run." This was, of course, precisely the procedure followed here. The consequence of C.T.E.'s thesis would appear to be that a person owning two or more tracks could conduct all of his races at one favored track while enjoying preferential tax treatment on the supposition that although all the races were run at a single track, they were conducted under two separate licenses and thus constituted two separate meetings.

We are of course not concerned here with the various provisions of the Act relating to licenses, meetings, tracks, allotment and transfer or racing dates as such. We are concerned with them only as they may affect the pari-mutuel tax where a racetrack operator has elected to permit wagering to take place at his track. We consider it implausible that the legislature, after having decreed a graduated tax, would permit the amount of the tax to fluctuate depending upon a determination by a licensee or the Board that races conducted at a single track should be classified as multiple meetings rather than as a single meeting. We conclude, therefore, that a straightforward reading of section 10a in the light of the underlying

purpose of the legislature does not permit the tax to be calculated on the basis proposed by C.T.E.

The conclusion reached above also disposes of No. 45589, which relates to the 1972 racing season. In October, 1971, C.T.E., as in the past, filed two separate applications for licenses and allotments of racing dates in the names of its two operating divisions. The Board, however, requested an opinion from the Attorney General as to whether these applications could validly be granted. The Attorney General rendered an opinion in the negative, one reason being that each track was owned by C.T.E. and not by a division, and that section 2 of the Act (Ill. Rev. Stat. 1971, ch. 8, par. 37b) provides: "The Board shall refuse racing dates and license to any applicant who does not at the time own or hold under lease a finished track ready for racing and for the accomodation of the public."

In answer to a further inquiry from the Board, the Attorney General expressed the opinion that the tax which should have been remitted for 1971, and for earlier years, should have been calculated by applying the tax to the "gross collections in any one year at any one race track or enclosure." Following the issuance of this opinion C.T.E. filed two new applications in its own name, one for a meeting to be held at Arlington Park and the other for one to be held at Washington Park, and the two licenses were accordingly issued. Departing from past practice, C.T.E. made no request that the Washington Park meeting be transferred to Arlington Park, but the Board nonetheless directed that this be done.

Quite apart from the fact that C.T.E. did not in any way resist this action by the Board, on the propriety of which we do not pass, we do not see that the absence of a request for a transfer in any way alters our previously expressed view that the tax is measured by the annual pari-mutuel handle at a given track.

C.T.E. also asserts that the recovery of back taxes is

barred by estoppel. Our decisions, however, have made it clear that the doctrine of estoppel cannot be invoked where governmental activities of the State are concerned, particularly those relating to the public revenues, except in extraordinary circumstances. This matter was recently discussed in *Austin Liquor Mart, Inc. v. Department of Revenue, 51 Ill.2d 1,* in which we held that acceptance of a payment made pursuant to a notice of tax liability did not estop the Department from re-examining the taxpayer's records for possible additional liability. We judge that that decision and others cited in the court's opinion are controlling here.

*Hickey v. Illinois Central R.R. Co., 35 Ill.2d 427,* on which C.T.E. relies, presented factual circumstances far removed from those now before us. *Hickey,* to begin, did not involve tax revenues but rather title to real property. The basis for permitting a defense of estoppel there was that the State and other governmental bodies had for a period of over 50 years, "consistently disclaimed any interest in the lands, title to which is now asserted, and have continuously acted as if they were owned in fee by the Illinois Central." (35 Ill.2d at 449-50.) There had been positive acts by responsible officials including actions by the adverse party, as opposed to mere inaction. See 35 Ill.2d 427, at 448; *cf. City of Quincy v. Sturhahn, 18 Ill.2d 604,* at 614.

That State inspectors performed the ministerial acts of computing the tax due under one particular formula does not estop the State from repudiating that formula. Too, under the circumstances here we must reject C.T.E.'s argument that a substantial portion of the amount of the track commission which remained after taxes, to the payment of which the licensee's share is subject (Ill. Rev. Stat. 1971, ch. 8, par. 37j), was, by contract, paid over to the owners of the horses running in the meet, and that there is, it is said, no method by which the excess received by the owners may be recovered by C.T.E. While this

would be of importance in a typical claim of estoppel, it cannot be considered when the doctrine of estoppel is inapplicable, as it is here.

*State v. Illinois Central R.R. Co., 246 Ill. 188,* on which C.T.E. also relies, is not inconsistent with the conclusion reached above. That case concerned a charter granted to the railroad under which the latter was required to pay a stipulated percentage of its gross receipts and to furnish a periodic statement of receipts to the Governor, who was empowered to ascertain its accuracy. The question in issue was the accuracy of these reports, and the court held that those which had been accepted without objection constituted "stated accounts," and could not be inquired into. (246 Ill. 188 at 249.) The question in the instant case does not involve the accuracy of the amounts reported but the basis on which the tax is to be levied. It is plain, too, that the court in the cited case, which did allow inquiry into other reports to which objection by the State had been made, did not intend to create an exception to the rule stated above as to estoppel, for it commented, "In attempting to collect this revenue the State is acting in its governmental capacity, the same as when it is attempting to collect taxes under the general revenue laws. This being so, public policy requires that the State shall not lose through the *laches* or negligence of its officers." 246 Ill. 188, 235.

In No. 45359 C.T.E. also urged that the entire 1965 amendment establishing graduated rates be held unconstitutional on the ground that the rates were discriminatory. The focus of the C.T.E. attack was not the fact of graduation itself but rather that the 1965 amendment contains two separate schedules with partially different brackets, whose application depends upon whether or not a racetrack is located within a county of 500,000 or more population or within 100 miles from a city having a population of 1,000,000 or more. As stated in C.T.E.'s brief, the effect of this contention, were it accepted,

would be to "hold the 1965 amendment invalid and reinstate prior section 10a which provided for a flat and uniform rate of tax."

The same contention was advanced in a counterclaim which was dismissed by the trial court, with no appeal being taken from the order of dismissal. The trial court did thereafter address itself to the merits of the constitutional objection in rendering its final judgment in the case, and rejected it on the ground that a greater privilege tax burden might be imposed "in those populous counties in which it logically assumed that there is a positive correlation between the number of people and the amount of money wagered and the ensuing profits which would result."

We agree with the trial court's disposition of this point. A classification based on population is not objectionable if it is reasonable and bears a rational relationship to the objective which the legislature seeks to accomplish. (*People ex rel. Vermilion County Conservation Dist. v. Lenover, 43 Ill.2d 209, 217-18.*) On the record before us C.T.E. has not demonstrated that the classification is clearly unreasonable or palpably arbitrary. *People ex rel. Stamos v. Public Building Com. of Chicago, 40 Ill.2d 164, 179-80; Thorpe v. Mahin, 43 Ill.2d 36, 45-46.*

For the reasons given, the decision of the circuit court of Cook County in each case must be reversed. The disposition we make of the appeal in No. 45589 renders it unnecessary to consider the question raised by the cross appeal of C.T.E.

*Judgments reversed.*

MR. JUSTICE GOLDENHERSH took no part in the consideration or decision of this case.