533 F.2d 1020
 In the Matter of F. W. KOENECKE & SONS, INC., an Illinois
Corporation, Bankrupt.
DEPARTMENT OF REVENUE OF the STATE OF ILLINOIS, Claimant-Appellant,
v.
Glenn R. HEYMAN, Trustee-Appellee.
 No. 75-1844.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 10, 1976.
Decided April 20, 1976.
Rehearing and Rehearing En Banc Denied June 2, 1976.
 
 Herbert Lee Caplan, Morris S. Bromberg, Asst. Attys. Gen., Chicago, Ill., for claimant-appellant.
 Louis W. Levit, Glenn R. Heyman, Chicago, Ill., for trustee-appellee.
 Before FAIRCHILD, Chief Circuit Judge, and TONE and BAUER, Circuit Judges.
 BAUER, Circuit Judge.
 
 
 1
 Involuntary bankruptcy proceedings were initiated against F. W. Koenecke & Sons, Inc. ("Koenecke") in 1969. Following an adjudication of bankruptcy a receiver/trustee was appointed and a priority tax claim was presented by the State of Illinois in the amount of $1,268,334.60 for unpaid taxes under the Illinois Cigarette Tax Act and Cigarette Use Tax Act for the period of July 1, 1965 to June 30, 1968. The bankruptcy judge disallowed the claim and the district court affirmed. The central issue on appeal is whether the State of Illinois is estopped to recover the taxes because of the involvement of state employees in Koenecke's plan to obtain maximum tax discounts through multiple licenses. We reverse.
 
 
 2
 Prior to its bankruptcy Koenecke was the largest licensed cigarette distributor in Illinois. It was required by Illinois law to collect and remit the tax imposed on the sale and use of cigarettes. Ill.Rev.Stats.1963, Ch. 120, §§ 453.1-453.67. A distributor prepays the cigarette tax by purchasing tax stamps and affixing them on the cigarettes to be sold. For its services in purchasing and affixing the stamps, Koenecke was entitled to receive a discount, which up until 1963 was a flat 5% of all stamps purchased.
 
 
 3
 By an Act approved July 16, 1963, Ill.Rev.Stats.1963, Ch. 120, § 453.2(b), the Illinois General Assembly enacted a graduated declining discount schedule to reflect the high volume distributor's decreased cost per revenue stamp affixed. The constitutionality of the graduated discount was upheld by the Illinois Supreme Court in Heyman v. Mahin, 49 Ill.2d 284, 275 N.E.2d 421, cert. denied 405 U.S. 1075, 92 S.Ct. 1499, 31 L.Ed.2d 809 (1972).
 
 
 4
 The maximum discount was fixed at 12/3% of the first $700,000 of tax paid by a licensed distributor during the year, reduced to 11/3% of the next $700,000, 1% of the next $700,000 and 2/3 of 1% of any additional taxes paid. The discount rate schedule was further revised in 1965 and 1967.
 
 
 5
 In the case of Koenecke, its volume of cigarettes sales was so high that the purchase of $700,000 in stamps occurred at the end of one week, and the minimum discount bracket was reached in the first three weeks of each year.
 
 
 6
 To circumvent the graduated declining discount formula of the statute and to insure the highest possible discount for its operations, Robert F. Koenecke, the principal shareholder of the bankrupt company, and his wife, filed over 52 multiple license applications as cigarette distributors in the individual names of company employees.
 
 
 7
 Theodore Issacs, then Director of the Illinois Department of Revenue, received a legal opinion from William J. Clark, then Attorney General for the State of Illinois, informing him that multiple licenses could not be issued to persons closely related to a distributor unless: "Separate applications are made by each licensee distributor which are in all other respects conformable to the statute. . . . " There is a serious dispute between the parties as to whether or not the Clark opinion sanctioned the multiple licensing scheme devised by Koenecke to obtain favorable tax treatment. Although the opinion is somewhat nebulous, we believe that the Attorney General's opinion made it clear that in order to obtain multiple licenses the persons applying must have been qualified distributors and not merely persons who purported to be distributors. Nevertheless, officials of the Illinois Department of Revenue having responsibility for administering the cigarette tax acts granted secondary or multiple licenses to persons closely related to Koenecke even though it was obvious that such secondary licensees were mere figureheads and were to be utilized solely for the purpose of avoiding the effect of the graduated discount law.
 
 
 8
 In fact employees of the state affirmatively participated in Koenecke's attempt to minimize taxes.[1] The evidence shows that one of the Department of Revenue's auditors actually taught Koenecke personnel how to compute and report the nominal intercompany transfers to and from secondary licensees which were shown on the monthly returns. It was admitted that from time to time Department personnel called Koenecke and other distributors to remind them that it was time to change licenses in order to avoid going over the $700,000 limit.
 
 
 9
 There is no doubt Koenecke's licensees were mere figureheads and never intended to or did, in fact, engage in the business as distributors of cigarettes. Many of the Koenecke employees, who were presented to the State of Illinois as licensees, denied signing or authorizing Koenecke to sign their signatures to the license applications. However two former key employees testified that it was common knowledge among all employees that their names were being used in order to obtain secondary licenses and thus qualify for maximum discounts. Koenecke testified that he had the express or implied authority of the person whose name he signed. The trial judge did not expressly find that Koenecke had authority but did find that the procedure was common knowledge among employees and that the secondary licenses were publicly displayed on a bulletin board in the common work room of the company.
 
 
 10
 In 1968, a new director, Theodore Jones, took action against the multiple license procedure used by Koenecke and other distributors. He ordered all of the so-called "secondary" licenses to be cancelled and directed his staff to make audits to assess the difference between the discounts received under the multiple licensing procedure and the correct discount available as a single licensed distributor.
 
 
 11
 Although the multiple license scheme originated with Koenecke, other smaller distributors in the state adopted the same practice. The state admits that they have not pursued collection of additional taxes from these distributors. Koenecke claims that such conduct is a violation of the constitutional right of equal protection and that it is a victim of the State's discriminatory tactics. However, the state contends that the evidence shows that only Koenecke consistently falsified license applications and that the record is barren of evidence that any other licensee was guilty of such flagrant conduct. In addition the state points out that Koenecke avoided over $2,000,000[2] in unpaid cigarette taxes while the average discrepancy for every other distributor was only $32,000. The State Department of Revenue's decision not to make assessments of the other distributors does not rise to the level of a controlling administrative determination of state law, especially in view of the Illinois Supreme Court cases discussed below. It amounted only to an election by the state to proceed only against Koenecke. That election did not violate Koenecke's federal equal protection rights, because the trustee has not shown that it "was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446, 453 (1962).
 
 
 12
 The application of the doctrine of estoppel in cases involving tax collection and revenue matters is a difficult question of Illinois law. On the one hand there are some clear decisions which hold that the State is estopped from denying or repudiating actions or conduct in which it actively participated. Pressed Steel Car Co. v. Lyons, 7 Ill.2d 95, 129 N.E.2d 765 (1955); People v. Thomas, 361 Ill. 448, 198 N.E. 363 (1935); Trustees v. Village of Cahokia, 357 Ill. 538, 192 N.E. 565 (1934); Melin v. Community Consolidated School District, 312 Ill. 376, 144 N.E. 13 (1924). The doctrine of estoppel has also been applied against the State where necessary to prevent patent unfairness or injustice. Hickey v. Illinois Central Railroad, 35 Ill.2d 427, 220 N.E.2d 415 (1966); New-Mark Builders, Inc. v. City of Aurora, 90 Ill.App.2d 98, 233 N.E.2d 44 (1967); City of Quincy v. Sturham, 18 Ill.2d 604, 165 N.E.2d 271 (1960).
 
 
 13
 On the other hand there is clear precedent that the estoppel doctrine should not apply against the State in revenue matters. Austin Liquor Mart Inc. v. Dept. of Revenue, 51 Ill.2d 1, 280 N.E.2d 437 (1972); Mr. Car Wash, Inc. v. Dept. of Revenue, 27 Ill.App.3d 931, 327 N.E.2d 88 (1975); People ex rel. Scott v. Chicago Thoroughbred Enterprises, Inc., 56 Ill.2d 210, 306 N.E.2d 7 (1974). The rationale of these cases is that people of the State should not be denied taxes rightfully owing because of mistakes or collusive fraud on the part of the state employees. The Illinois Supreme Court expressed this principle in the Austin Liquor Mart, supra, case, where it stated:
 
 
 14
 "Plaintiff contends that a 'final assessment' is equally binding on both parties and once the notice of tax liability becomes final and the assessment is paid, defendant is barred from further investigation. We do not agree. It is firmly established that where the public revenues are involved, public policy ordinarily forbids the application of estoppel to the State. Department of Revenue v. Barding, 33 Ill.2d 235, 210 N.E.2d 475; Skillet Fork River Outlet Union Drainage Dist. v. Central Lumber Co., 31 Ill.2d 312, 201 N.E.2d 447; People v. Chas. Levy Circulating Co., 17 Ill.2d 168, 161 N.E.2d 112; Clare v. Bell, 378 Ill. 128, 37 N.E.2d 812; People v. Women's Athletic Club, 360 Ill. 577, 196 N.E. 881; 1 A.L.R.2d 338."
 
 
 15
 In this case we think the facts are more closely analogous to the line of cases that hold that the state may not be estopped by the conduct of its employees in revenue matters. We are persuaded primarily by the Chicago Thoroughbred Enterprises decision (supra ) which is strikingly similar to the issues and facts presented by Koenecke's multiple license plan to defeat the graduated discount formula for cigarette tax collections.
 
 
 16
 In Chicago Thoroughbred Enterprises the Illinois General Assembly also enacted a graduated horse racing privilege tax to replace a prior flat rate tax. Chicago Thoroughbred Enterprises was the largest horse racing licensee in the State, and was the only Illinois operator to fall within the maximum rate of the new graduated tax schedules.
 
 
 17
 Because of its size and volume of operations, Chicago Thoroughbred Enterprises was able to avoid taxes averaging $750,000 per year by dividing itself into two purported racing divisions and obtaining two separate licenses.
 
 
 18
 As with Koenecke, the State officials responsible for issuing licenses, and for daily calculating and collecting the taxes due, permitted the multiple license scheme to exist without protest until five years later. By the time an independent suit was filed by the Illinois Attorney General, the total amount of unpaid horse racing privilege taxes had accumulated to $4,937,687.21 for the period 1966 through 1971.
 
 
 19
 The taxpayer first contested the constitutionality of the graduated tax and then argued that the State was estopped to retroactively recompute the tax due. As in the case at bar, the taxpayer argued that its corporate operations and the use of designated racing divisions were well known to State officials and were unchallenged throughout the period in dispute. The taxpayer pointed out that the State actually provided its own inspectors at the track who had verified the tax figures and accepted the tax payment for each racing day without objections.
 
 
 20
 Similar to Koenecke's argument that it passed on its tax savings to the consumers, the taxpayer in the Chicago Thoroughbred Enterprises case argued that it never even received 44% of the monies in dispute which were immediately distributed as purses to the horsemen participating in the daily races. And further, the taxpayer noted, the corporate ownership had been subsequently purchased by the present management in reliance upon public and company books and records and balance sheets showing no outstanding tax liability.
 
 
 21
 Despite these truly extraordinary circumstances and despite the active participation and approval of State officials in every phase of the multiple licensing scheme, and despite the equitable arguments advanced by the taxpayer, the Illinois Supreme Court said, in reversing the trial court: "That State inspectors performed the ministerial acts of computing the tax due under one particular formula does not estop the State from repudiating that formula", and entered judgment against Chicago Thoroughbred Enterprises for $4,947,687.21 and in a companion case ordered the release to the State of an additional $642,968 from a protest fund established for 1972 taxes.
 
 
 22
 Although appellee Koenecke's argument in favor of estoppel has some tone of sympathy in light of the facts of this case, we nevertheless feel compelled to follow the decision of the Illinois Supreme Court in Chicago Thoroughbred Enterprises. The facts of the Chicago Thoroughbred Enterprises case are directly on point and the Court leaves no doubt as to its ruling, stating:
 
 
 23
 " . . . Our decisions, however, have made it clear that the doctrine of estoppel cannot be invoked where governmental activities of the State are concerned, particularly those relating to the public revenues, except in extraordinary circumstances" (56 Ill.2d at 220, 306 N.E.2d at 12).
 
 
 24
 We do not perceive this case as being one of extraordinary circumstances in which gross injustice or inequity results. Certainly the equities were even more on the side of the taxpayer in Chicago Thoroughbred Enterprises than in the present case. Yet, the Court held that those facts did not present extraordinary circumstances. Thus the State of Illinois is not estopped from presenting its tax claim in this bankruptcy proceeding and it was error for the claim to be barred.
 
 
 25
 On appeal, the trustee has also raised several collateral points which we believe deserve comment. First, the argument is made that the State's claim was properly subordinated to the claims of the general creditors. We agree that under basic equitable principles a bankruptcy court has the inherent power to permit any portion of claims to participate on a parity with or subordinate to the claims of general creditors. Pepper v. Litton, 308 U.S. 295, 304-5, 60 S.Ct. 238, 244, 84 L.Ed. 281, 287-288 (1939); Collier on Bankruptcy, Vol. 3, P 57.14, pp. 211-212. But in this instance we think the bankruptcy judge's conclusion of law # 16 was wrong in holding that it would be inequitable for the State to participate on a priority or even equal basis with the other creditors. We believe that the proper view of the facts does not show that the state is profiting at the expense of the creditors. Rather all the people of the State are benefited when taxes which are lawfully owing are collected. Therefore we are of the opinion that the bankruptcy judge should not have subordinated the State's claim to the claims of general creditors unless the general creditors can establish some type of priority for their claims under the bankruptcy act. However considering the history of this case and the conduct of the State, any claims for interest or costs of collection would be inequitable and properly disallowed by the bankruptcy court. The creditors of Koenecke, of course, are not being penalized or prosecuted in any way. Their complaints are against Koenecke not the State. Their right to enjoy the illegal fruit of the Koenecke scheme by usurping the unpaid State taxes resulting from the multiple license plan can be no greater than the taxpayer's right to avoid those taxes.
 
 
 26
 The trustee has also raised the question of whether the State's claim here is merely for a return of compensation as opposed to a claim for taxes. He points out that if the claim is for compensation and not taxes it can only rank as a general unsecured claim. In our view there is no doubt that the claim presented is for taxes. Although the discount allowed by the State is intended to compensate the distributor for the costs of affixing the stamps, Heyman v. Mahin, supra, indicates that the distributor must pay the taxes based on sales after subtracting his discount. The money wrongfully withheld by Koenecke is that amount over and above the allowable discount for compensation of costs of affixing the stamps, i. e., money owed to the State for each tax stamp that was placed on each package of cigarettes distributed.
 
 
 27
 Finally, the trustee points out that the State's charges of fraud and corruption are not supported in the record, and that the charge of collusion was raised for the first time on appeal. We agree with the trustees that the State had ample opportunity to develop such evidence, and, having failed to do so, is not now in a position to advance such an argument. Nevertheless, in reaching our decision we have relied primarily on the Illinois Supreme Court's decision in Chicago Thoroughbred Enterprises and not on the State's allegation of fraud and collusion.
 
 
 28
 Accordingly, the judgment of the district court is reversed and the case is remanded for further proceedings not inconsistent with this opinion.
 
 
 29
 REVERSED.
 
 
 
 [1]
 The record indicates that not all state employees were willing to cooperate with the Koenecke plan. Hildren L. Carney, Supervisor of Liquor & Cigarette Revenue Division, who was immediately responsible for processing and approving license applications, objected to the issuance of multiple licenses. However, he was ordered by his superior to "be a good soldier, or a good boy and see that these licenses are issued" (Tr. 3/18/74 a. m., pp. 52, 59, 61, 87; Tr. 3/18/74 p. m., pp. 9, 19)
 
 
 [2]
 No claim has been filed for additional unpaid taxes, estimated to be $800,000, for the two year period from July 16, 1967 to June 30, 1965, for which recovery is barred by statute (Ill.Rev.Stats.1973, Ch. 120, § 444)