THE CITY OF GENEVA *et al.*, Plaintiffs-Appellants, v. THE DU PAGE AIRPORT AUTHORITY *et al.*, Defendants-Appellees.

Second District No. 2—89—0303

Opinion filed January 26, 1990.

Robert F. Casey and Theodore G. Schuster, both of St. Charles, and

Sheridan & Associates, of Wheaton (Gerald M. Sheridan, Jr., of counsel), for appellants.

Mark E. Shure, of McDermott, Will & Emery, and Terry M. Grimm, of Winston & Strawn, both of Chicago (Steven H. Hoeft and John H. Brechin, of counsel), for appellees Du Page Airport Authority, Thomas H. Fawell, Sr., Ralph Smykal, Donald J. Figura, Thomas O. Marziani, Ronald A. DaRosa, John G. Morris, Larry L. Thompson, Roger C. Marquardt, Charles D. Berls, William G. Gebhardt, Jr., and Rudy Rau.

No brief filed for other appellees.

JUSTICE WOODWARD delivered the opinion of the court:

Plaintiffs, the City of Geneva, the City of Batavia, the City of St. Charles, and the Village of Wayne, filed a seven-count complaint seeking a declaratory judgment and *quo warranto* relief against the defendants, the Du Page Airport Authority (DAA), the Fox Valley Airport Authority (FVAA), and their commissioners and officers. Specifically, the plaintiffs sought to have Public Act 84—1473 held unconstitutional. Three counts of the complaint were withdrawn, and the case went to a bench trial on the four remaining counts of the amended complaint. After hearing evidence, the trial court entered a final judgment in favor of the defendants and against plaintiffs on all four counts of the complaint as amended. Plaintiffs appeal.

Plaintiffs raise the following issues on appeal: whether Public Act 84—1473 is unconstitutional as special legislation; whether Public Act 84—1473 is unconstitutional as a violation of the equal protection clause of the Illinois Constitution; whether Public Act 84—1473 automatically dissolved the FVAA; whether the general obligation bond issued by the DAA is void; whether sections of Public Act 84—1473 are void for vagueness; and whether the Village of Wayne has the right to approve all extensions of runways of the Du Page Airport pursuant to section 1731 of the Aviation Facilities Expansion and Improvement Act (49 U.S.C. §1731 (1982)). In addition, the defendants raise the issue whether plaintiffs have standing to challenge the constitutionality of Public Act 84—1473.

The Chicago metropolitan area regional airport system presently consists of the primary "hub" airports, O'Hare, Midway, and Meigs, owned by the City of Chicago, seven "reliever" airports, and the Joliet Park District Airport, a general aviation airport. There are also private airports in the six-county area. One reliever airport is located in each of the five "collar" counties, and two reliever airports are lo-

cated in suburban Cook County. These seven airports handle the overflow from O'Hare, as well as regular commercial service. The four primary reliever airports of concern here are: Du Page, Palwaukee, Aurora, and Waukegan.

While serving similar functions, there are notable differences in these facilities. For example, at 4,000 feet, Du Page has the shortest runway of the four reliever airports. The shorter runway restricts the airport's capacity and reduces its safety margin. Due to its shorter runway, the Federal Aviation Authority (FAA) has designated Du Page as a general utility airport, while the other three are designated transport airports. The distinction means that the Du Page Airport cannot handle aircraft as large as the other primary reliever airports.

Both the Du Page Airport and the Palwaukee Airport have less sophisticated instrument landing systems than the other two primary reliever airports. As a result, they have higher landing minimums, which restrict their capacity and lower their safety margin.

As for the number of operations (takeoffs or landings) at each airport, in 1987, there were approximately 221,000 operations at Du Page, 218,000 at Palwaukee, 142,000 at Aurora, and 95,000 at Waukegan. In addition, in 1987, there were 526 aircraft based at Du Page; 279 aircraft based at Aurora; 460 based at Palwaukee; and 267 aircraft based at Waukegan. The demand at Du Page and Palwaukee is higher than at the other primary reliever airports because they are closer to O'Hare Airport.

The business use of an airport is measured by itinerant (aircraft landing at Du Page Airport that did not originate there), as opposed to local, operations. During 1987, Du Page had 109,000 itinerant operations, Palwaukee had 125,000, Aurora had 47,000, and Waukegan had 36,000 itinerant operations.

The areas of comparison of greatest concern in this appeal are those of compatibility with the surrounding land use and opportunity for expansion. Certain land uses are more compatible with the operation of an airport than others. Agricultural use is the most compatible, while residential use is the least compatible. Incompatible land use limits the usefulness of an airport. The land uses surrounding the four primary reliever airports reflect four distinct stages of urban encroachment. Palwaukee Airport is surrounded by mixed-use development, including residential, commercial, and industrial. Waukegan Airport is on the verge of being surrounded by residential land use. Du Page Airport has residential and industrial land uses along its western and eastern boundaries, but open land to the south and north of the airport. The current flight patterns of the Du Page Airport are

concentrated over the residential and industrial developments to the east and the west. The Aurora Airport is surrounded by farmland.

According to Roger Barcus, bureau chief of airport administration, Department of Transportation (DOT), an airport needs to acquire as much land as possible so that it can control the development around it. Each of the four primary reliever airports faces different problems in acquiring land. The Palwaukee Airport is hampered in growth by the price of the land surrounding it, some $150,000 or more an acre. The Waukegan Airport is surrounded by noise-sensitive residential use. The Aurora Airport has ample opportunity to expand since it is surrounded by farmland selling for approximately $6,000 per acre. Du Page has open space to the north and south. Due to the urban growth in the Du Page area and the rising costs of land acquisition, it is important for Du Page to act now in acquiring additional land.

Prior to 1974, the Du Page Airport was owned by Du Page County. When Du Page County announced plans to expand the airport, the FVAA was formed under "An Act in relation to airport authorities" (the Municipal Airport Authorities Act or Act) (Ill. Rev. Stat. 1975, ch. 15½, par. 68.1 *et seq.*) as a municipal airport authority. The original FVAA board consisted of seven commissioners, one each appointed by the municipalities of Geneva, St. Charles, Batavia, and West Chicago, and three appointed by the State legislators representing the legislative districts which encompassed the FVAA territory.

The FVAA was authorized under the Act to issue general obligation bonds and levy an airport tax within the limits set in the Act. By 1986, the income from field operations approximately covered the cost of operating the airport. Approximately 77% of the taxes levied for the corporate fund and the bond issue for purchase of the airport was collected from Kane County taxpayers in Batavia, Geneva, and St. Charles townships. By 1987, the FVAA had a property-tax base of approximately $732 million, which resulted in tax revenues of $250,000 per year, and a bonding limit of $5.49 million.

Airport improvements, on the other hand, are funded under program priorities established by the FAA on a national basis and the DOT on a State basis. The FAA has established the following priorities for the use of Federal funds: safety projects, preservations projects, standard projects, upgrade projects, and capacity projects. Under the DOT 1989-92 program, the distribution of Federal and State funds will be allotted as follows: safety and preservation, 32%; standards, 39%; upgrade, 8%; and capacity 31%.

The most preferred and common method of funding airport im-

provements is by the local sponsor applying for Federal grants. If a grant is approved, the improvements are not made until after the Federal and State funds are actually available. The most usual formula for Federal grants is: Federal, 90%; State, 5%; and local sponsor, 5%.

Federal funds may also be obtained through reimbursement. The local sponsor spends the money first and seeks FAA reimbursement later. A letter of intent can be obtained from the FAA for future Federal reimbursement for land acquisition or for construction of runways. However, issuance of a letter of intent is not a guarantee of reimbursement or that it will be reimbursed within any specific period of time. Specific steps are required to qualify for a Federal grant or reimbursement, namely: the local sponsor must complete and obtain approval of an "Airport Layout Plan" (ALP) by both DOT and the FAA; after ALP approval, an environmental impact assessment must be performed relating to projects planned in the ALP; and no Federal funds will be disbursed until both the above steps have been completed. An ALP shows the airport as it is now and as it is planned at some future date, usually 20 years in the future. According to Roger Barcus, the FVAA diligently attempted to get a new ALP approved by DOT and the FAA from 1981-86, but it was never approved. The FVAA never failed to apply for any grant of money.

In September 1985, the Act was amended by Public Act 84—994, which authorized the chairman of the Du Page County Board to appoint a majority of the FVAA commissioners. Public Act 84—994 applied to an airport authority located in a county which had a population in excess of 600,000 and less than 3 million. At that time, only the FVAA and Du Page County met that population classification.

In January 1987, the Act was again amended, by Public Act 84—1473, which created a metropolitan airport authority in every county which had a population in excess of 600,000 and less than 3 million and was located contiguous to Cook County. Only Du Page County currently falls within those classifications. Under Public Act 84—1473, the FVAA was dissolved, and DAA was formed as a metropolitan airport authority; DAA assumed control of the Du Page Airport. The property-tax base of the DAA, which includes all of Du Page County, is more than $10 billion and is 13 times larger than the FVAA's tax base. It has a bond debt limit of more than $83 million. Eight of the nine commissioners of the DAA are appointed by the chairman of the Du Page County Board. Also, the DAA was empowered to levy an airport tax of .075% of assessed valuation and issue general obligation bonds of .75% of assessed valuation *without referendum*. Ill. Rev.

Stat. 1987, ch. 15½, pars. 68.2b, 68.2g, 68.13, 68.14a, 68.14e.

From the testimony at trial, it appears that the impetus to form the DAA was the failure of the FVAA to move quickly enough to acquire land for expansion of the airport facilities. In the case of the Palwaukee Airport, two local municipalities refused to pay their share of the cost of purchasing the private airport which was then for sale. Rather than lose Palwaukee's reliever capacity, the State and the FAA subsidized the local owner's share and paid approximately $40 million to acquire the airport.

In the case of the FVAA, in 1979, the FVAA hired Crawford, Murphy & Tilly, Inc. (CMT), an engineering firm, to prepare the ALP. The FAA, the State, and the CMT recommended to the FVAA that it acquire a corridor of land south from the airport to Fermi Lab. The plan submitted by the FVAA to the FAA in 1986 called for some land to be acquired but none south of Roosevelt Road. Moreover, the FVAA would not proceed with any land acquisition or construction until it received a Federal grant. Because of the steadily rising land prices, the State considered it most economical to acquire the land as soon as possible and, thus, avert the Palwaukee situation (land around Palwaukee is now valued at $150,000 an acre).

In holding that Public Act 84—1473 was constitutional, the trial court noted that there was no question that the legislation was designed solely for the Du Page Airport, but that, in and of itself, did not amount to the special legislation prohibited by the Illinois Constitution. The trial judge stated:

"I believe there is sufficient basis in the record for the legislation to withstand the constitutional challenge.

Some of the reasons for the differential treatment include both the history that airports in Illinois are different, have their own problems and have received different treatment.

Specifically, of the four primary reliever airports for O'Hare, the record shows that the Du Page Airport is unique. It is unique for various reasons, one being the runway length.

For that reason alone, Du Page, by the FAA, is classified a utility airport and others are classified transport airports.

But I think one of the most important reasons for differential treatment are the land uses surrounding the four reliever airports.

Each represents a different stage of urban development, each reflect[s] different market values accordingly, each offers different opportunities for expansion; I think those factors, along with the need, as expressed in the record, for the imple-

mentation of the Airport Layout Plan here in Du Page with a priority rather than with a slower pace.

Basically, I think it has been shown that the Du Page Airport needs and its present opportunity are unlike the needs and opportunities present at the other reliever airports."

This appeal followed.

Since plaintiffs have challenged the constitutionality of Public Act 84—1473, we will briefly review the standards appropriate to deciding constitutional challenges to statutory enactments before delving into the merits of plaintiffs' argument.

Statutes are presumed to be constitutional, and one who challenges a provision has the burden of establishing its invalidity. (*Pre-School Owners Association v. Department of Children & Family Services* (1988), 119 Ill. 2d 268, 275.) Reasonable doubts must be resolved in favor of upholding the validity of the legislation establishing a classification. (*In re Belmont Fire Protection District* (1986), 111 Ill. 2d 373, 380.) When a classification under a statute is called into question, if any state of facts can reasonably be conceived to sustain the classification, the existence of that state of facts at the time the statute was enacted must be presumed. (*Chicago National League Ball Club, Inc. v. Thompson* (1985), 108 Ill. 2d 357, 369.) It is not required that the classification be accurate, logical, harmonious, or scientific, so long as it is not arbitrary and will accomplish the legislative purpose. (*People ex rel. Curren v. Wood* (1945), 391 Ill. 237, 255.) Finally, although a trial court's findings are always subject to review, especially when the evidence is conflicting, the trial judge as the trier of fact is in a position superior to a court of review to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence and determine the preponderance thereof. The reviewing court may not overturn a judgment merely because it might disagree with it or might have reached a different conclusion. Thus, the reviewing court will not disturb a trial court's finding and substitute its own opinion unless the holding of the trial court is manifestly against the weight of the evidence. (*Greene v. City of Chicago* (1978), 73 Ill. 2d 100, 110.) We now turn to the merits of plaintiffs' case.

Plaintiffs contend, first, that Public Act 84—1473 is unconstitutional as special legislation and violative of the equal protection clause.

A "special" law confers some special right, privilege, or immunity or imposes some particular burden upon some portion of the people of the State but less than all. (*In re Belmont Fire Protection*

*District*, 111 Ill. 2d at 379.) The purpose of the special legislation prohibition in the constitution was to prevent the enlargement of the rights of one or more persons and the impairment of, or discrimination against, the rights of others. (*Gaca v. City of Chicago* (1952), 411 Ill. 146, 149.) However, legislative classification is not forbidden, since perfect uniformity of the treatment of all persons is neither practical nor desirable. *In re Belmont Fire Protection District*, 111 Ill. 2d at 379.

■■ ■ Denial of equal protection occurs when the government withholds from a person or class of persons a right, benefit, or privilege without a reasonable basis. Legislation which confers a benefit on one class and denies the same to another may be attacked both as special legislation and as a denial of equal protection, but under either ground for challenge, it is the duty of the courts to decide if the classification is reasonable. (*Chicago National League Ball Club, Inc.*, 108 Ill. 2d at 367-68.) Though the constitutional protections invoked are not identical, a claim that the special-legislation provision has been violated is generally judged by the same standard that is used in considering a claim that equal protection has been denied. 108 Ill. 2d at 368.

■ In *In re Belmont Fire Protection District*, our supreme court stated as follows:

"In order for a legislative classification by population to withstand constitutional scrutiny, it cannot be arbitrary. The legislature cannot create a class through the medium of an arbitrary statutory declaration in order that the class may be the recipient of special and exclusive legislative favors. [Citation.] To render a statutory classification valid, the classification *must be based upon a rational difference of situation or condition found to exist in the persons or objects upon which the classification rests*. [Citations.]

In considering the special-legislation proscription of our constitution, in addition to a reasonable basis for the classification, the classification *must also bear a rational and proper relation to the evil to be remedied and the purpose to be attained by the legislation*. [Citations.] Thus there is a two-prong test." (Emphasis added.) 111 Ill. 2d at 379-80.

Plaintiffs contend that the proofs at trial did not show any rational connection between the populations of the six metropolitan Chicago counties and any need for a countywide airport with authority to issue bonds and tax for airport purposes without referendum. In *People ex rel. Curren v. Wood* (1945), 391 Ill. 237, the Act was attacked, *inter alia*, as unconstitutional special legislation because it classified

airport authorities by population and location. Our supreme court disagreed, stating that "courts have frequently recognized that traffic and transportation conditions in larger cities require special treatment and afford a reasonable basis for classification." 391 Ill. at 252.

Nevertheless, plaintiffs maintain that there is nothing unique about the need for extensive funds to acquire land for reliever airports and nothing unique about the way the money is obtained, *i.e.*, Federal grants. Plaintiffs point out that since the DAA took over for the FVAA, the tax levies have increased enormously (6,300% in 1987 and 11,100% in 1988) and argue that, had a referendum been necessary, it is unlikely that the citizenry would have approved such bonds. Moreover, this money is being used to acquire land which will be used at least initially for expressways and shopping centers. Finally, the population of Du Page County rose in the 1970's and early 1980's; yet the number of airport operations decreased substantially and has not again achieved the peak reached in 1973.

■ The trial court here found that there was no question that Public Act 84—1473 was designed solely for the Du Page County Airport. However, the fact that legislation applies to a single place does not render it unconstitutional. (*Du Bois v. Gibbons* (1954), 2 Ill. 2d 392, 399.) When a claim of unconstitutional special legislation or denial of equal protection is raised, the threshold inquiry is whether some entity situated similarly to those affected by the statute has been excluded. *Chicago National League Ball Club, Inc.*, 108 Ill. 2d at 367-68.

The defendants argue that no other airport, airport authority, or county is similarly situated to the DAA, the Du Page Airport or Du Page County. The plaintiffs, however, admit that the needs of the reliever airports are similar *but differ in degree*, particularly in the area of land acquisition.

The chief distinctions between the Du Page Airport and the other reliever airports, particularly Palwaukee Airport, are that Du Page has the shortest runway length and, as such, the only reliever airport designated as a utility airport rather than a transport airport; it has slightly more operations than the others; there are more aircraft based at Du Page Airport; and although both Aurora and Du Page Airports have an opportunity for expansion, it is necessary that Du Page's acquisition of land take place at once, due to the escalating prices of land in Du Page County. Plaintiffs argue that none of these differences justifies the "Du Page exception."

■ Legislation which affects only one similarly situated entity is constitutional so long as there is a rational justification for the legisla-

tive focus and the classifications used to focus the legislation are reasonably related to that justification. (*In re Belmont Fire Protection District*, 111 Ill. 2d at 380.) We agree with the defendants that the plaintiffs failed to prove that the statute was enacted only for reasons totally unrelated to the pursuit of a legitimate State goal. See *Bilyk v. Chicago Transit Authority* (1988), 125 Ill. 2d 230.

■ The separate treatment of the Du Page Airport is justified given its role as the busiest reliever airport and its opportunity for expansion. There was testimony at trial that a $1.7 million shortfall in reliever operations capacity was anticipated for northeastern Illinois by the year 2000, and, thus, the State's first priority is to improve existing reliever airports. The enhanced tax base provides the additional funds for such improvements. The evidence reflects that the FVAA was unwilling to engage in land acquisition unless it received Federal money. By waiting, however, there was testimony to the effect that the land values were escalating, and the land south of the Du Page Airport could become more expensive. Upon its formation, the DAA promptly implemented the land acquisition and engineering necessary to improve the airport without the necessity of the Federal grants. While perhaps not the best or most reasonable solution to the problem, we cannot say that the creation of the DAA was palpably arbitrary. See *People ex rel. Curren v. Wood* (1945), 391 Ill. 237.

■ Plaintiffs further argue that the population and location classifications of Public Act 84—1473 are unrelated to the reason why the State needed to protect and improve the Du Page Airport. However, the legislature has frequently used population and location classifications to focus legislation on specific problems. (See, *e.g.*, *People ex rel. Kutner v. Cullerton* (1974), 58 Ill. 2d 266 (provision allowing counties with more than 200,000 population to classify real estate for taxation); *People ex rel. Scott v. Chicago Thoroughbred Enterprises, Inc.* (1973), 56 Ill. 2d 210 (race track located within 100 miles of city with 1 million population or in county of 500,000 population taxed at a different rate than other race tracks in the State); *Bridgewater v. Hotz* (1972), 51 Ill. 2d 103 (statute providing for the nomination and election of county board members in counties having a population of 3,000,000 or less).) "Before a court can interfere with the legislative judgment in [a] case, it must be able to say that there is no fair reason for the law which would not require with equal force its extension to other cities of smaller population which are not affected." (*Gaca*, 411 Ill. at 149.) It is the plaintiff's burden to show that a population classification is arbitrary, not the defendant's burden to show the classification is reasonable. *Majidi v. Palmer* (1988), 175 Ill. App. 3d 679,

683.

In *Chicago National League Ball Club, Inc. v. Thompson* (1985), 108 Ill. 2d 357, our supreme court upheld a population classification as a means of identifying a number of population-related factors which merited special treatment for Wrigley Field. While the challenged statute did not name Wrigley Field as its object, the court concluded that Wrigley Field was the focal point. After considering a number of population-related factors, such as density, road congestion, and adjoining land uses, the court upheld the statute even though none of the factors were identified in the statute. Likewise, in *People ex rel. County of Du Page v. Smith* (1961), 21 Ill. 2d 572, the supreme court upheld a statute which authorized only the "collar" counties around Cook County to build sewage facilities and to issue bonds to pay for the facilities. The statute did not name the counties, but the legislature limited the application of the statute to those counties adjoining a county with a population in excess of 1 million. The court took judicial notice of the overflow of business and population from Cook County in the collar counties and upheld the statute because of the "unique population and territorial combination giving rise to sewage and pollution problems of unusual magnitude and urgency." (21 Ill. 2d at 579.) Again, the population factors which the court found to justify the statutory population classifications were not listed in the statute.

 We note that there was conflicting testimony as to whether there was any correlation between airport demand and population. In deciding that the statute was constitutional, the trial court implicitly found that there was a correlation between the two, and since there was evidence to the effect at trial, we will not disturb that finding.

Plaintiffs rely on *In re Belmont Fire Protection District* (111 Ill. 2d 373). In that case, the trial court held section 19a of "An Act in relation to fire protection districts" (Ill. Rev. Stat., 1984 Supp., ch. 127½, par. 38.2a(a)) to be unconstitutional. Section 19a(a) provided that in any county having a population of 600,000 but less than 1 million, fire-protection services could be consolidated into a single fire-protection district. In upholding the finding of unconstitutionality, the court determined that the countywide population classification bore no rational relationship to the purpose of the Act and the evil it sought to remedy, *i.e.*, having multiple fire-protection districts serving one municipality. Although the court was urged to take judicial notice of the unique geographic, demographic, and political circumstances arising from the phenomenal growth and development of Du Page County, the court observed that the classification in section 19a(a) was

based on population, not urbanization or density of population. Therefore, the court concluded, if there is an evil in having a municipality experiencing rapid growth served by more than one fire-protection district, then it would rationally follow that the statute in question should be based on either the population, urbanization, or density of the municipality involved, not the population of the county in which the municipality lies, since many other small towns in other counties are also experiencing rapid growth. *In re Belmont Fire Protection District,* 111 Ill. 2d at 385.

In the case before us, however, as previously pointed out, there is evidence that the Du Page Airport is different from other airports and that its needs and opportunities are unique and unlike the needs and opportunities facing other reliever airports. Thus, *In re Belmont Fire Protection District* is distinguishable from the case at bar.

We conclude, therefore, that Public Act 84—1473 is neither special legislation, nor violative of the equal-protection clause of our State constitution.

Next, plaintiffs contend that the FVAA was not automatically dissolved by Public Act 84—1473.

Section 2.7(b) of the Act (Ill. Rev. Stat. 1987, ch. 15½, par. 68.2g(b)) provides as follows:

"(b) If all of the airport facilities of an existing Airport Authority are situated within the corporate limits of a county in which a Metropolitan Airport Authority is established, the existing Airport Authority shall be dissolved upon the establishment of the Metropolitan Airport Authority."

Count II of plaintiffs' complaint was a *quo warranto* action which alleged that not all the "airport facilities" of the Du Page Airport were located in Du Page County when the DAA took control of the airport and, therefore, FVAA was not automatically dissolved when the DAA was created.

The Act provides the following definitions:

" 'Airport' means any locality, either land or water, which is used or designed for the landing and taking off of aircraft, or for the location of runways, landing fields, airdromes, hangars, buildings, structures, airport roadways and other facilities."

" 'Facilities' means and includes real estate and all forms of tangible and intangible personal property and services used or useful as an aid, or constituting an advantage or convenience to, the safe landing, taking off and navigation of aircraft, or the safe and efficient operation or maintenance of a public air-

port." Ill. Rev. Stat. 1987, ch. 15½, par. 68.1.

Plaintiffs conclude that because markers and the clear zone on the west end of runway 10/28 extend into Kane County, not all Du Page Airport facilities are located in Du Page County.

■■■ We agree with plaintiffs that if the legislative intent can be determined from the plain language of the statute, it must prevail. (*Western National Bank v. Village of Kildeer* (1960), 19 Ill. 2d 342, 350.) However, it is equally as true that courts will avoid a construction of a statute which would render any portion of it meaningless or void. (*Harris v. Manor Healthcare Corp.* (1986), 111 Ill. 2d 350, 362-63.) Throughout this case, plaintiffs have taken the position that the FVAA was dissolved by Public Act 84—1473. Yet, as defendants point out, if the DAA could not operate the Du Page Airport, then the DAA has no function, and the statute would be meaningless.

■■■ Moreover, the use of the term "airport facilities" of an existing airport indicates that only those facilities actually owned by the FVAA are material to the issue of dissolution. The clear zones are airspace over which the United States has sovereignty. (See 49 U.S.C. §§1304, 1348 (1982).) The markers are owned by the FAA, not the FVAA.

We conclude that the trial court correctly determined that the FVAA was dissolved by Public Act 84—1473.

■■■ Next, plaintiffs contend that, in the event this court determines Public Act 84—1473 to be unconstitutional, then the general obligation bond issued by the DAA is void. As we have determined that Public Act 84—1473 is constitutional, there is no merit to this argument.

Next, plaintiffs contend that certain portions of Public Act 84—1473 are so vague and uncertain as to violate the due-process clause of the 1970 Illinois Constitution.

Under Public Act 84—1473, a township located outside of Du Page County but which was part of the FVAA is permitted to disconnect from the authority. (Ill. Rev. Stat. 1987, ch. 15½, par. 68.17a.) Where a township chooses to disconnect, the DAA pays to the township a sum not in excess of the township's "investment." Ill. Rev. Stat. 1987, ch. 15½, par. 68.17b.

Plaintiffs argue that these provisions are incomprehensible because no township has ever had a financial interest in the DAA, and because the payback provision refers to a court proceeding in which the airport, its improvements, and facilities, the amount expended by the DAA or the FVAA, and the amount of bonded indebtedness owned by the DAA or the FVAA are described.

Plaintiffs also point out that in the event of a disconnection, section 17.1 of the Act (Ill. Rev. Stat. 1987, ch. 15½, par. 68.17a) provides that the annual tax levy be discontinued by referendum. Yet, plaintiffs argue, the townships have no obligation for the debts of the airport authority. It is the property owners whose real estate is subject to the bond issue levy ordinances. Plaintiffs assert that the "disconnection" provisions do not expressly or implicitly provide for the removal of the liens of the bond issue levies, and, therefore, the taxpayers of a "disconnected" township will be deprived of due process of law if the "disconnection" provision is exercised.

██ Where a statute is so uncertain that people of ordinary intelligence must guess at its meaning, the statute denies due process. (*Krebs v. Thompson* (1944), 387 Ill. 471, 477.) An act is void if the language of the statute, on its face, appears to have a meaning which is impossible to give a precise or intelligent application in the circumstances under which it is intended to operate. *Spinelli v. Immanuel Lutheran Evangelical Congregation, Inc.* (1987), 118 Ill. 2d 389, 402.

 █ Defendants argue that because plaintiffs failed to raise this argument in the trial court, it is waived. (*Western Casualty & Surety Co. v. Brochu* (1985), 105 Ill. 2d 486.) Moreover, we perceive that plaintiff's argument is not directed at the "vagueness" of the statute as much as at the fact that plaintiffs believe the taxpayers, not the townships, should receive the benefit of disconnection. A statute is sufficiently specific where its terms serve as an adequate guide for those to whom it applies. (*People v. Davis* (1982), 106 Ill. App. 3d 260, 264.) Even if plaintiffs' argument was not waived, we would agree with the defendants that fair reading of the statute obviously calls for the payback to the township of all the funds invested by the citizens of that township. Therefore, the above sections of Public Act 84—1473 are not unconstitutionally vague.

Finally, plaintiffs contend that pursuant to section 1731 of the Aviation Facilities Expansion and Improvement Act (49 U.S.C. §1731 (1982)), the Village of Wayne must approve any plan to extend runways using Federal funds for that purpose.

Section 1731 provides as follows:

> "Notwithstanding any other provision of the Airport and Airway Improvement Act of 1982 [49 App. U.S.C. 2201 *et seq.*], no airport development project under such Act involving the construction or extension of any runway may be approved by the Secretary at any general aviation airport *** located astride a line separating two counties within a single State if, before the submission of such project to the Secretary, such project has

not been approved by the governing body of any village incorporated under the laws of that State which is located entirely within five miles of the nearest boundary of such airport." (49 U.S.C. §1731 (1982).)

It is not disputed that the DAA intends to extend runways using Federal funds and has not and does not intend to obtain the consent of the Village of Wayne.

 In order for section 1731 to apply to the Village of Wayne, the Du Page Airport must lie "astride" a county line. "Astride" means "placed or lying on both sides of." (Webster's Third New International Dictionary 135 (1986).) The evidence is clear and the trial court so found that the Du Page Airport is located entirely within Du Page County. Therefore, section 1731 does not apply to the Village of Wayne.

The defendants raise the argument that the plaintiffs lack standing to challenge the constitutionality of the Act. Deciding the case as we do, we need not reach that issue.

The judgment of the circuit court is affirmed.

Affirmed.

REINHARD and INGLIS, JJ., concur.