807 N.E.2d 1207 (2004)
348 Ill. App.3d 44
283 Ill.Dec. 366
Philip N. CRUSIUS, a State of Illinois Taxpayer, on Behalf of and For the Benefit of the TAXPAYERS OF THE STATE OF ILLINOIS, Plaintiff-Appellant,
v.
ILLINOIS GAMING BOARD; Gregory C. Jones, Tobias G. Barry, Ira Rogal; Elzie Higginbottom, and Robert A. Mariano, in Their Official Capacities as Members of the Illinois Gaming Board; Daniel W. Hynes, in his Official Capacity as Illinois State Comptroller; and Judy Baar Topinka, in her Official Capacity as Illinois State Treasurer, Defendants-Appellees (The Village of Rosemont, an Illinois Municipal Corporation, Intervenor Defendant-Appellee).
No. 1-02-2819.
Appellate Court of Illinois, First District, First Division.
March 31, 2004.
*1211 Better Government Association, Chicago (Terrance A. Norton and Jay E. Stewart, of counsel), for Plaintiff-Appellant.
Lisa Madigan, Attorney General (Mary E. Welsh, of counsel), and Gary S. Feinerman, Solicitor General, Chicago, for Defendants-Appellees.
Quinlan & Carroll, Ltd., Chicago (William R. Quinlan, James R. Carroll, James A. Niewiara, and Nicholas G. Grapsas, of counsel), for Intervenor Defendant-Appellee.
Justice McBRIDE delivered the opinion of the court:
At issue in this case is the constitutionality of section 11.2(a) of the Riverboat Gambling Act (230 ILCS 10/11.2(a) (West 2000)), which allows "[a] licensee that was not conducting riverboat gambling on January 1, 1998[, to] apply to the [Illinois Gaming] Board for [license] renewal and approval of relocation to a new home dock location." Illinois citizen and taxpayer Philip N. Crusius filed an action on behalf of all Illinois taxpayers and the State of Illinois seeking a declaratory judgment that section 11.2(a) violated the constitutional *1212 ban on special legislation (Ill. Const. 1970, art. IV, § 13) (count I). Crusius also sought to enjoin the expenditure of any state funds (count II) or the transfer of any state property (count III) in the administration of Public Act 91-40 section 30, the public act which includes section 11.2(a) and contains an inseverability clause. Public Act 91-40, § 30, eff. June 25, 1999. The circuit court of Cook County found that section 11.2(a) did not violate the constitution's prohibition on special legislation and dismissed Crusius' action with prejudice. Crusius appeals.
The defendants named in Crusius' action were the Illinois Gaming Board, the individual board members, the State Comptroller, and the State Treasurer. The Village of Rosemont, Illinois (Rosemont), was subsequently granted leave to intervene as a defendant, based on a petition indicating a gaming licensee, Emerald Casino, Inc. (Emerald), had applied for approval to relocate to Rosemont pursuant to section 11.2(a).
Defendants maintain that Crusius lacks standing. Defendants challenged his standing by way of motions for involuntary dismissal under section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2000)), which was an appropriate avenue for asserting the affirmative defense of standing. Chicago Teachers Union, Local 1 v. Board of Education of the City of Chicago, 189 Ill.2d 200, 206, 244 Ill.Dec. 26, 724 N.E.2d 914, 918 (2000); Greer v. Illinois Housing Development Authority, 122 Ill.2d 462, 494, 120 Ill.Dec. 531, 524 N.E.2d 561, 575 (1988) (standing is an affirmative defense). The determination of whether a plaintiff has standing to sue is based upon the allegations of his complaint. Martini v. Netsch, 272 Ill.App.3d 693, 695, 208 Ill.Dec. 974, 650 N.E.2d 668, 670 (1995). A section 2-619 motion admits the legal sufficiency of the complaint, but raises defects, defenses, or other affirmative matter apparent on the face of the complaint or established by external submissions which defeat the action. AIDA v. Time Warner Entertainment Co., L.P., 332 Ill.App.3d 154, 158, 265 Ill.Dec. 582, 772 N.E.2d 953, 957, 772 N.E.2d 953, 957 (2002). When ruling on a section 2-619 argument, a court must accept as true all well-pled facts in the plaintiff's complaint and all inferences that reasonably can be drawn in the plaintiff's favor. Chicago Teachers Union, 189 Ill.2d at 206, 244 Ill.Dec. 26, 724 N.E.2d at 918. Our review of the disposition of a section 2-619 motion is de novo. Chicago Teachers Union, 189 Ill.2d at 206, 244 Ill.Dec. 26, 724 N.E.2d at 918.
The doctrine of standing ensures that the person pursuing the action has a real interest in the outcome of the controversy. Chicago Teachers Union, 189 Ill.2d at 206, 244 Ill.Dec. 26, 724 N.E.2d at 918. In a declaratory judgment action, there must be an "actual" controversy between adverse parties and the party seeking the declaratory judgment must be "interested" in the controversy. Flynn v. Ryan, 199 Ill.2d 430, 436, 264 Ill.Dec. 710, 771 N.E.2d 414, 418 (2002).
The "actual controversy" component of standing "`"does not mean that a wrong must have been committed and injury inflicted. Rather, it requires a showing that the underlying facts and issues of the case are not moot or premature, so as to require the court to pass judgment on mere abstract propositions of law, render an advisory opinion, or give legal advice as to future events. [Citations.] The case must, therefore, present a concrete dispute admitting of an immediate and definitive determination of the parties' rights, the resolution of which will aid in the termination of the controversy or some part thereof [Citations.]"'" Flynn, 199 Ill.2d *1213 at 436-37, 264 Ill.Dec. 710, 771 N.E.2d at 418, quoting Illinois Gamefowl Breeders Ass'n v. Block, 75 Ill.2d 443, 450-51, 27 Ill.Dec. 465, 389 N.E.2d 529 (1979).
Additionally, the "interested in the controversy" component of standing "`"does not mean merely having a curiosity about or a concern for the outcome of the controversy. Rather, the party seeking relief must possess a personal claim, status, or right which is capable of being affected."'" Flynn, 199 Ill.2d at 437, 264 Ill.Dec. 710, 771 N.E.2d at 418, quoting Gamefowl Breeders, 75 Ill.2d at 450-51, 27 Ill.Dec. 465, 389 N.E.2d 529.
Therefore, to have standing to challenge the constitutionality of a statute, the plaintiff must have sustained or be in immediate danger of sustaining a direct injury as a result of the enforcement of the statute. Flynn, 199 Ill.2d at 437, 264 Ill. Dec. 710, 771 N.E.2d at 418-19; Chicago Teachers Union, 189 Ill.2d at 206, 244 Ill.Dec. 26, 724 N.E.2d at 918. The plaintiff's "claimed injury must be (1) distinct and palpable; (2) fairly traceable to [the] defendant's actions; and (3) substantially likely to be prevented or redressed by the grant of the requested relief." Chicago Teachers Union, 189 Ill.2d at 207, 244 Ill.Dec. 26, 724 N.E.2d at 918.
A taxpayer may enjoin the use of public funds, based upon the taxpayers' ownership of the funds and their liability to replenish the public treasury for the deficiency caused by the misappropriation thereof. Martini, 272 Ill.App.3d at 695, 208 Ill.Dec. 974, 650 N.E.2d at 670 (and cases cited therein). "Consequently, a taxpayer has standing to bring suit, even in the absence of a statute, to enforce the equitable interest in public property which he claims is being illegally disposed of." Martini, 272 Ill.App.3d at 696, 208 Ill.Dec. 974, 650 N.E.2d at 670. In addition, section 11-301 of the Code of Civil Procedure provides, "An action to restrain and enjoin the disbursement of public funds by any officer or officers of the State government may be maintained either by the Attorney General or by any citizen and taxpayer of the State." 735 ILCS 5/11-301 (West 2000). See also 735 ILCS 5/11-303 (West 2000) (specifying procedures for commencing citizen's action). Crusius' action was premised on section 11-301.
There is no requirement that a plaintiff taxpayer have a substantial individual interest when bringing suit under section 11-301. Snow v. Dixon, 66 Ill.2d 443, 450, 6 Ill.Dec. 230, 362 N.E.2d 1052, 1055 (1977), citing the Disbursement of Public Moneys Act (Ill.Rev.Stat.1975, ch. 102, par. 11 et seq. (now 735 ILCS 5/11-301 (West 2000)). Further, even though a taxpayer is not subject to the provisions of the act, the taxpayer may bring suit to enjoin misuse of public funds in administering an illegal legislative act. Snow, 66 Ill.2d at 450, 6 Ill.Dec. 230, 362 N.E.2d at 1055; Krebs v. Thompson, 387 Ill. 471, 56 N.E.2d 761 (1944) (addressing plaintiff's arguments, after noting plaintiff did not claim to be subject to challenged act or affected by its provisions, except as a taxpayer).
These principles indicate that plaintiff Crusius had standing. He had the right to enforce his interest as a taxpayer in public resources that were allegedly being used in administering an illegal legislative act. He alleged a distinct and palpable injury to a legally cognizable interest in state resources. The expenditure of the state resources was traceable to the actions of the Illinois Gaming Board, the State Comptroller, and the State Treasurer. If the court granted the requested declaration and injunctions, further injury to the taxpayer's interests would have been prevented.
*1214 We reject defendants' contention that Crusius lacked standing because he erroneously alleged he "has paid taxes to the State of Illinois in the form of riverboat admission tax and riverboat wagering tax," when these taxes are actually paid by gaming licensees, not visitors of the riverboats. See 230 ILCS 10/12, 13 (West 2000). This allegation, although erroneous, was unnecessary in light of his earlier, undisputed allegation that he "paid, and is paying taxes to the State of Illinois, including, but not limited to, sales taxes, income taxes, motor vehicle taxes and motor vehicle fuel taxes." Crusius' inclusion of a superfluous, erroneous allegation was of no consequence in light of other allegations indicating he was interested in the outcome of the controversy. Cole v. Guy, 183 Ill.App.3d 768, 773-74, 132 Ill.Dec. 126, 539 N.E.2d 436, 440 (1989) ("If a complaint contains allegations that are not necessary to the plaintiff's cause of action, a court will treat those allegations as mere surplusage, which does not destroy the sufficiency of the plaintiff's complaint").
We also reject defendants' contention that Crusius lacked standing because he alleged at best only a nominal, formal, or technical interest in the subject matter of his action similar to the one alleged in Lyons v. Ryan, 201 Ill.2d 529, 269 Ill.Dec. 374, 780 N.E.2d 1098 (2002). The Lyons action is dissimilar, not similar to Crusius' action. First, the type of activity at issue differs. Crusius complained that taxpayer funds were being used in administering an illegal statute, while Lyons complained that certain state officers and employees engaged in criminal activity to obtain political campaign contributions for a state official (Lyons, 201 Ill.2d at 531, 269 Ill.Dec. 374, 780 N.E.2d at 1100-01). Second, the legal theory of relief differs. Crusius sought to enjoin subsequent expenditures of state resources, while Lyons sought to impose a constructive trust over illegally obtained, privately held contributions, in addition to the cost of state equipment used in the illegal scheme, and the salaries of the state officers and employees involved in the illegal scheme (Lyons, 201 Ill.2d at 537, 269 Ill.Dec. 374, 780 N.E.2d at 1104). The supreme court rejected Lyons' taxpayer standing argument, indicating that the private campaign contributions had no impact on the state treasury and that there was no basis for concluding the government's equipment and salary expenditures would not have been made in the absence of the illegal scheme. Lyons, 201 Ill.2d at 537-38, 269 Ill.Dec. 374, 780 N.E.2d at 1104. The court determined that the "real party in interest" was the state, not individual taxpayers, because the state, not individual taxpayers, would be entitled to the benefits of a successful action. Lyons, 201 Ill.2d at 534, 269 Ill.Dec. 374, 780 N.E.2d at 1102. The state had an actual and substantial interest in the subject matter of the action, as distinguished from a party who had only a nominal, formal, or technical interest in, or connection with, the case. Lyons, 201 Ill.2d 529, 269 Ill.Dec. 374, 780 N.E.2d 1098. Further, taxpayer standing could not be based on the creation of "public" funds through the imposition of a constructive trust. Lyons, 201 Ill.2d at 538, 269 Ill.Dec. 374, 780 N.E.2d at 1104. Accordingly, the Attorney General, as the chief law enforcement officer of the state, was empowered to represent Illinois in the litigation, not its individual taxpayers. Lyons, 201 Ill.2d 529, 269 Ill.Dec. 374, 780 N.E.2d 1098. Thus, the defendants to this taxpayer action misinterpret Lyons. It has no application here because Crusius did not seek a constructive trust over private donations generated through criminal activity and held by someone other than the State Treasurer, in addition to past salary and equipment expenditures. Crusius sought *1215 a declaration of unconstitutionality and to enjoin subsequent misuse of state resources in administering the allegedly unconstitutional statute.
We also reject defendants' assertion that Crusius' action was prematurely commenced because pending litigation over Emerald's interest in the gaming license made it possible that Emerald would never relocate under the provisions of section 11.2(a). Defendants misconstrue the nature of plaintiff's allegations. Crusius plainly stated that public funds had been and were being expended to implement section 11.2(a), by alleging as follows:
"On September 24, 1999[, after section 11.2(a) was enacted,] Emerald Casino, Inc. applied for renewal of its owner's license and for the relocation of its riverboat license from East Dubuque, Illinois to Rosemont Illinois. On January 30, 2001 the Illinois Gaming Board denied Emerald Casino, Inc.'s renewal and relocation application. Pursuant to Illinois Gaming board regulations, Emerald Casino, Inc. has retained possession of the license pending an administrative law judge's review of the Illinois Gaming Board's decision."
These were indications that the Board had not only acted on a section 11.2(a) application, it was currently defending its action in an administrative proceeding.
In fact, defendant Rosemont made similar allegations in its petition to intervene in Crusius' action, stating:
"Pursuant to section 11.2[(a),] Emerald Casino, Inc. * * * applied for relocation of its * * * license to the Village of Rosemont. Rosemont has a proprietary interest in the transfer of Emerald's gaming license and the development of a casino and entertainment complex in Rosemont.
Plaintiff seeks to have Public Act 91-40 nullified. If successful, plaintiff will effectively nullify the relocation of Emerald Casino's gaming license to Rosemont."
It cannot be seriously contended that the additional conduct negated Crusius' allegations indicating that he sustained or was in immediate danger of sustaining an injury as a result of the implementation of the challenged statute. In contrast, in defendants' cited case, Flynn, a former village trustee and a state senator challenged the constitutionality of the State Gift Ban Act (5 ILCS 425/1 et seq. (West 2000)) (Flynn, 199 Ill.2d at 431-32, 264 Ill.Dec. 710, 771 N.E.2d at 415-16), despite the fact that neither plaintiff had been subjected to or was in immediate danger of being subjected to disciplinary action under that statute for soliciting or accepting a prohibited gift. Flynn, 199 Ill.2d at 437-38, 264 Ill.Dec. 710, 771 N.E.2d at 419. The supreme court pointed out the plaintiffs "[did not] even claim that they have given or would like to give a prohibited gift under the [State Gift Ban] Act." (Emphasis in original.) Flynn, 199 Ill.2d at 438, 264 Ill.Dec. 710, 771 N.E.2d at 419. The court refused to determine the constitutionality of a statute which did not affect the parties to the cause under consideration. Flynn, 199 Ill.2d at 438-39, 264 Ill.Dec. 710, 771 N.E.2d at 420. Flynn's standing analysis is not applicable here.
Finally, we reject defendants' contention that Crusius lacked standing because the tax funds at issue were paid into a special fund in the state treasury, the State Gaming Fund, by gaming licensees, instead of into the general revenue fund by individual citizens such as plaintiff. See 30 ILCS 105/5 (West 2000) (indicating there are special funds in the state treasury, specified in subsequent subsections); 30 ILCS 105/5.286 (West 2000) (specifying *1216 State Gaming Fund); 230 ILCS 10/23 (West 2000) (creating State Gaming Fund, "a special fund in the State Treasury"); 230 ILCS 10/12, 13 (West 2000) (indicating licensees pay admission and wagering taxes); 30 ILCS 105/4 (West 2000) (indicating funds not belonging to any special fund constitute the general revenue fund). The funds, regardless of their source, were paid into the state treasury and became state funds available for state expenditure. See 30 ILCS 230/1, 2 (West 2000) (indicating, with few exceptions, every board or agency of the state is required to pay into the state treasury the gross amount of all money received, no later than the day following its receipt). Furthermore, the supreme court has rejected the argument that segregating funds into a "special fund" in the state treasury deprives an Illinois citizen of taxpayer standing. Hallstrom v. City of Rockford, 16 Ill.2d 297, 157 N.E.2d 23 (1959) (rejecting argument that because funding for implementation of city ordinance came from Motor Fuel Tax Fund, a "special fund" in the state treasury, taxpayer could not challenge city ordinance); 30 ILCS 105/5.34 (West 2000) (specifying special Motor Fuel Tax Fund). Compare Barco Manufacturing Co. v. Wright, 10 Ill.2d 157, 139 N.E.2d 227 (1956) (indicating that the unemployment compensation fund was a "trust fund" which was required to be held separate and apart from public monies or funds of the state; therefore, petitioners had to show a special injury different in degree and kind from that suffered by the public at large in order to challenge disbursements). The source or the State Treasurer's subsequent classification of the tax dollars did not affect plaintiff Crusius' interest in the outcome of this controversy.
Defendants also sought dismissal of the complaint with prejudice pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2000)), arguing that because section 11.2(a) was not special legislation, Crusius failed to state a claim. The circuit court granted dismissal on this basis. On appeal, Crusius contends the circuit court's determination was erroneous because section 11.2(a) is special legislation.
A section 2-615 motion admits all well-pled facts and attacks only the legal sufficiency of the complaint. AIDA, 332 Ill.App.3d at 158, 265 Ill.Dec. 582, 772 N.E.2d at 957. Our review of a trial court's dismissal of a complaint pursuant to section 2-615 is de novo. AIDA, 332 Ill.App.3d at 158, 265 Ill.Dec. 582, 772 N.E.2d at 958.
The portion of the Illinois Constitution prohibiting special legislation states: "The General Assembly shall pass no special or local law when a general law is or can be made applicable. Whether a general law is or can be made applicable shall be a matter of judicial determination." Ill. Const.1970, art. IV, § 13. "[T]he purpose of the special legislation clause is to prevent arbitrary legislative classifications that discriminate in favor of a select group without a sound, reasonable basis." Best v. Taylor Machine Works, 179 Ill.2d 367, 391, 228 Ill.Dec. 636, 689 N.E.2d 1057, 1069-70 (1997). The special legislation clause prohibits the legislature from "conferring a special benefit or exclusive privilege upon a person or a group of persons to the exclusion of others similarly situated." Best, 179 Ill.2d at 391, 228 Ill.Dec. 636, 689 N.E.2d at 1069. When a statute is attacked as special legislation, the court determines whether the statutory classification is unreasonable in that it preferentially and arbitrarily includes a class to the exclusion of all others. Illinois Polygraph Society v. Pellicano, 83 Ill.2d 130, 138, 46 Ill.Dec. 574, 414 N.E.2d 458, 463 (1980). "[L]egislative classification is not forbidden, *1217 since perfect uniformity of the treatment of all persons is neither practical nor desirable." City of Geneva v. Du Page Airport Authority, 193 Ill.App.3d 613, 622, 140 Ill.Dec. 625, 550 N.E.2d 261, 267 (1990). Further, the legislature has great flexibility in making statutory classifications. In re Estate of Jolliff, 199 Ill.2d 510, 520, 264 Ill.Dec. 642, 771 N.E.2d 346, 352 (2002). However, a court will invalidate legislative classifications under the special legislation clause where the classification has an artificially narrow focus and appears to be designed primarily to benefit a particular private group without a reasonable basis. Best, 179 Ill.2d at 395, 228 Ill.Dec. 636, 689 N.E.2d at 1071.
A strong presumption of constitutionality is given to legislative enactments and a party challenging a statute on constitutionality grounds bears the burden of clearly rebutting this presumption. Estate of Jolliff, 199 Ill.2d at 517, 264 Ill.Dec. 642, 771 N.E.2d at 350. Courts will affirm a statute's constitutionality if the statute is "reasonably capable of such an interpretation." Estate of Jolliff, 199 Ill.2d at 517, 264 Ill.Dec. 642, 771 N.E.2d at 350; Alamo Rent A Car, Inc. v. Ryan, 268 Ill.App.3d 268, 272, 205 Ill.Dec. 738, 643 N.E.2d at 1349 (1994) ("Courts are obligated to affirm the constitutionality and validity of statutes if possible").
Because neither a suspect classification nor fundamental right is at issue, the "appropriate measure" of section 11. 2's constitutionality is "the deferential rational basis test, which asks whether the statutory classification is rationally related to a legitimate government interest." Estate of Jolliff, 199 Ill.2d at 520, 264 Ill.Dec. 642, 771 N.E.2d at 352. Under the rational basis test, if a court can conceive of circumstances which justify distinguishing the class benefitted by the statute from the class outside its scope, the classification is constitutional. Estate of Jolliff, 199 Ill.2d at 520, 264 Ill.Dec. 642, 771 N.E.2d at 352; Alamo Rent A Car, 268 Ill.App.3d at 272, 205 Ill.Dec. 738, 643 N.E.2d at 1349 ("The rational basis test requires that there be some reasonable relationship between the challenged legislation and a conceivable and perhaps unarticulated governmental interest"). In other words, under the rational basis test, "the court may hypothesize reasons for the legislation, even if the reasoning advanced did not motivate the legislative action." Alamo Rent A Car, 268 Ill.App.3d at 272-73, 205 Ill.Dec. 738, 643 N.E.2d at 1349. If there is any conceivable basis for finding a rational relationship, the court will uphold the law. Alamo Rent A Car, 268 Ill. App.3d at 273, 205 Ill.Dec. 738, 643 N.E.2d at 1349.
Further, the person challenging the law bears the burden of negating every conceivable basis which supports it (Alamo Rent A Car, 268 Ill.App.3d at 273, 205 Ill.Dec. 738, 643 N.E.2d at 1350), and a court will resolve all reasonable doubts in favor of a statute's validity. Estate of Jolliff, 199 Ill.2d at 517, 264 Ill.Dec. 642, 771 N.E.2d at 350. Whether a statute is wise or the best means for accomplishing the desired result is a matter for the legislature, not the courts, to determine. Alamo Rent A Car, 268 Ill.App.3d at 273, 205 Ill.Dec. 738, 643 N.E.2d at 1350.
The 1990 Riverboat Gambling Act authorized the Illinois Gaming Board to issue up to 10 licenses for riverboat gambling. 230 ILCS 10/5, 7 (West 2000). The legislature specified that four licenses were to be issued for riverboat gambling on the Mississippi River, one was to be issued for riverboat gambling on the Illinois River south of Marshall County, one was to be issued for riverboat gambling on the Des Plaines River in Will County, and the locations of the four other licenses were to be *1218 determined by the Board. 230 ILCS 10/7(e) (West 2000). When granting licenses, the Board was permitted to give favorable consideration to economically depressed areas of Illinois and to applicants presenting plans providing for significant economic development over a large geographic area. 230 ILCS 10/7(e) (West 2000). The Act was "intended to benefit the people of the State of Illinois by assisting economic development and promoting Illinois tourism." 230 ILCS 10/2 (West 2000).
The record indicates that on July 9, 1992, the Board issued one of the first set of licenses to Emerald's corporate predecessor to operate a riverboat casino at a home dock on the Mississippi River in East Dubuque, Illinois. Further, Emerald operated the casino in East Dubuque for several years, but strong competition from nearby Iowa riverboats and other factors caused Emerald to cease operations on July 29, 1997.
Effective June 1999, the legislature revised the Riverboat Gambling Act with the adoption of Public Act 91-40 (Pub. Act 91-40, § 30, eff. June 25, 1999). One of the revisions was the creation of the statute at issue, section 11.2(a). The new legislation also made changes to the Illinois Horse Racing Act of 1975 (230 ILCS 5/1 et seq. (West 2000)) and the State Finance Act (30 ILCS 105/1 et seq. (West 2000)), and included an inseverability clause providing that if any provision of the Act is held to be invalid, the entire Act is void. Pub. Act 91-40, § 30, eff. June 25, 1999.
As indicated above, Emerald applied for relocation pursuant to section 11.2(a), and this taxpayer litigation with regard to the constitutionality of the section 11.2(a) ensued.
Plaintiff taxpayer now argues section 11.2(a) is special legislation because it arbitrarily bestows a special benefit or privilege to a "class of one," the one riverboat gambling licensee that was not conducting operations on January 1, 1998, to the exclusion of the nine other similarly situated licensees. It is indisputable that the legislation discriminates in favor a select group, the class of riverboat gambling licensees not conducting operations on January 1, 1998, to the exclusion of all other riverboat gambling licensees. However, the classification created by section 11.2(a) is not arbitrary and shares a rational relationship with the purpose of the Riverboat Gambling Act. The classification permits the only dormant licensee, the only one of 10 licensees that was not furthering the Riverboat Gambling Act's stated purpose of "benefit[ting] the people of the State of Illinois by assisting economic development and promoting Illinois tourism" (230 ILCS 10/2 (West 2000)) to request relocation to a viable home dock. Prior to the creation of section 11.2(a), the purpose of the Riverboat Gambling Act was frustrated because there was no avenue for a licensee in a proven nonviable site to seek relocation to a site where the licensee could generate economic benefits for Illinois' citizens and taxpayers. In fact, another panel of this appellate court, although not considering the constitutionality of 11.2(a), remarked that it was "obvious" that the "purpose of [this revision to the Riverboat Gambling Act] was to resurrect the tenth license after nearly two years of inactivity" in order to meet the Act's stated purpose and begin producing much needed revenue for Illinois. Emerald Casino v. Illinois Gaming Board, 346 Ill.App.3d 18, 33, 281 Ill.Dec. 293, 803 N.E.2d 914 (2003). Under the deferential rational basis test, the constitutionality of the statute must be affirmed. The legislature's classification between licensees in known nonviable and viable locations was not arbitrarily narrow and does not appear *1219 to have been designed to benefit a particular group without a reasonable basis. Section 11.2(a) was not special legislation.
Plaintiff's reliance on cases such as Callaghan & Co. v. Smith, 304 Ill. 532, 136 N.E. 748 (1922), In re Day, 181 Ill. 73, 54 N.E. 646 (1899), People ex rel. City of Kewanee v. Kewanee Light & Power Co., 262 Ill. 255, 104 N.E. 680 (1914), Wilson v. All-Steel, Inc., 87 Ill.2d 28, 56 Ill.Dec. 897, 428 N.E.2d 489 (1981), and Chavda v. Wolak, 188 Ill.2d 394, 242 Ill.Dec. 606, 721 N.E.2d 1137 (1999), is misplaced, because in those instances the legislative classifications were arbitrary. As examples, the statute in Callaghan arbitrarily authorized one publisher to produce official compilations of state statutes, without any consideration for price (Callaghan, 304 Ill. 532, 136 N.E. 748), and the law in Day arbitrarily discriminated between law school graduates of apparently equal learning caliber, character, and ability to engage in legal practice, based on the date they began their studies. Day, 181 Ill. 73, 54 N.E. 646.
Plaintiff's suggestion that laws affecting a "class of one" are per se illegal is inaccurate, as demonstrated by cases such as City of Geneva v. Du Page Airport Authority, 193 Ill.App.3d 613, 140 Ill.Dec. 625, 550 N.E.2d 261 (1990), Chicago National League Ball Club, Inc. v. Thompson, 108 Ill.2d 357, 91 Ill.Dec. 610, 483 N.E.2d 1245 (1985), and Bilyk v. Chicago Transit Authority, 125 Ill.2d 230, 125 Ill. Dec. 822, 531 N.E.2d 1 (1988).
There was no question in City of Geneva that the legislation at issue was designed to benefit just one of four primary "reliever" airports that were handling increasing overflow from Chicago's O'Hare field. City of Geneva, 193 Ill. App.3d at 623-24, 140 Ill.Dec. 625, 550 N.E.2d at 267-68. The challenged legislation applied only to counties which were contiguous to Cook County (Chicago) and which had a population level between 600,000 and 3 million. City of Geneva, 193 Ill.App.3d at 619, 140 Ill.Dec. 625, 550 N.E.2d at 264. Only Du Page County fit within these narrow classifications when the legislation was adopted. City of Geneva, 193 Ill.App.3d at 619, 140 Ill.Dec. 625, 550 N.E.2d at 264. The legislation dissolved the Fox Valley Airport Authority, a multi-county entity which had controlled the Du Page County airport, but which had not acted quickly enough in a rising market to acquire surrounding land necessary for expansion of the Du Page facilities. City of Geneva, 193 Ill.App.3d at 619-20, 140 Ill.Dec. 625, 550 N.E.2d at 264-65. In fact, the old multi-county board had been willing to acquire only some of the land that was recommended by its own engineering study, and it would not proceed with any acquisition or construction until it received a federal grant, which was not forthcoming. City of Geneva, 193 Ill.App.3d at 620, 140 Ill.Dec. 625, 550 N.E.2d at 265. The legislation set up a new airport authority, known as the Du Page Airport Authority, and it gave the new one-county board the powers to collect significantly more property taxes and to issue general obligation bonds without referendum. City of Geneva, 193 Ill.App.3d at 618-20, 140 Ill.Dec. 625, 550 N.E.2d at 264-65. Eight out of nine members of the Du Page Airport Authority were to be appointed by the commissioner of the Du Page County Board (City of Geneva, 193 Ill.App.3d at 619-20, 140 Ill.Dec. 625, 550 N.E.2d at 264-65), in sharp contrast to the prior airport authority, which had been appointed by the State legislators representing the multi-county Fox Valley territory, and the municipalities of Geneva, St. Charles, Batavia, and West Chicago. City of Geneva, 193 Ill.App.3d at 618, 140 Ill. Dec. 625, 550 N.E.2d at 264. The newly *1220 appointed one-county authority promptly implemented the land acquisition and engineering necessary to improve the Du Page facilities without waiting for federal funds. City of Geneva, 193 Ill.App.3d at 624, 140 Ill.Dec. 625, 550 N.E.2d at 268. The four ousted municipalities challenged the new enactments on special legislation grounds, arguing there were not enough differences amongst the four airports relieving O'Hare traffic to warrant making a "Du Page exception." City of Geneva, 193 Ill.App.3d at 623, 140 Ill.Dec. 625, 550 N.E.2d at 267. Their argument was not persuasive. The trial court initially noted there was no question the legislation was designed solely for the Du Page facility, but that did not mean, in and of itself, that the enactments were prohibited special legislation. City of Geneva, 193 Ill.App.3d at 620, 140 Ill.Dec. 625, 550 N.E.2d at 265. Legislation that affects only one entity will be found constitutional provided there is a rational justification for its limited application and its narrow classifications are reasonably related to that justification. City of Geneva, 193 Ill.App.3d at 623-24, 140 Ill.Dec. 625, 550 N.E.2d at 267. The record showed that the State needed to expand reliever airport capacity in northeastern Illinois because it was anticipating even more overflow from O'Hare field. City of Geneva, 193 Ill.App.3d at 624, 140 Ill.Dec. 625, 550 N.E.2d at 267. The record also showed that the Du Page facility was the busiest of the four reliever airports, yet it had significantly less capacity and safety margins than the other so-called "similarly situated" reliever airports. City of Geneva, 193 Ill.App.3d at 617, 140 Ill.Dec. 625, 550 N.E.2d at 263. The Du Page instrument landing systems were lacking, and it had the shortest runway of the four facilities. City of Geneva, 193 Ill.App.3d at 617, 140 Ill.Dec. 625, 550 N.E.2d at 263. The record also established that the Du Page facility had a unique window of opportunity to expand before encroaching urbanization caused surrounding land values to escalate prohibitively. City of Geneva, 193 Ill. App.3d at 623-24, 140 Ill.Dec. 625, 550 N.E.2d at 267-68. In other words, the Du Page County airport had needs and opportunities that it did not share with the three other overflow facilities. City of Geneva, 193 Ill.App.3d at 621, 626, 140 Ill.Dec. 625, 550 N.E.2d at 265, 269. Therefore, legislation allowing for rapid improvement of only the Du Page County facilities, a "class of one," could not be construed as arbitrarily narrow, and it withstood the plaintiffs' special legislation challenge. City of Geneva, 193 Ill.App.3d at 624, 140 Ill.Dec. 625, 550 N.E.2d at 268.
We also point out in Chicago National League Ball Club, the only professional or amateur sporting venue in the entire State of Illinois that was affected by legislation effectively prohibiting night games was the home field of the Chicago Cubs, Wrigley Field. Chicago National League Ball Club, 108 Ill.2d at 363, 91 Ill.Dec. 610, 483 N.E.2d at 1248. At the time, however, Wrigley Field was the only open-air ball park in the state that was surrounded by a densely populated urban neighborhood. Chicago National League Ball Club, 108 Ill.2d at 363-371, 91 Ill.Dec. 610, 483 N.E.2d at 1248-52. Similarly, in Bilyk, Chicago's mass transportation provider, the Chicago Transit Authority or CTA, was the only private or public transportation carrier (Bilyk, 125 Ill.2d at 236-37, 125 Ill.Dec. 822, 531 N.E.2d at 3) and the only municipal entity in Illinois (Bilyk, 125 Ill.2d at 240-41, 125 Ill.Dec. 822, 531 N.E.2d at 5) that was protected from tort liability by the statute under scrutiny. In both of these additional instances, legislation affecting a "class of one" survived the plaintiffs special legislation arguments, because there were sufficient differences between the lone class member and other *1221 entities. Chicago National League Ball Club, 108 Ill.2d at 369-71, 91 Ill.Dec. 610, 483 N.E.2d at 1251-52; Bilyk, 125 Ill.2d at 238, 244, 125 Ill.Dec. 822, 531 N.E.2d at 4, 7.
The fact that section 11.2(a)'s date requirement restricts the statute's current application to only one current licensee is not dispositive. As the three cases just discussed illustrate, classifications which result in a class as small as one member are legitimate classifications if there are attributes or needs which warrant particularized treatment. Department of Business & Economic Development v. Phillips, 43 Ill.2d 28, 31, 251 N.E.2d 170, 172 (1969). The classification in this instance was warranted. There was a need to remedy the only failed riverboat gambling operation. Further, although the legislature could have taken another approach, such as revoking the license of the one non-viable operation and inviting new applicants, the legislature, not the courts, determines whether a statute is wise or the best means for accomplishing the desired result. Alamo Rent A Car, 268 Ill.App.3d at 273, 205 Ill.Dec. 738, 643 N.E.2d at 1350.
Plaintiff contends, however, that the classification is illegitimate because other existing riverboats which were in operation on January 1, 1998, but which subsequently fail will not be covered by section 11.2(a), despite having an equal need to relocate to a potentially viable site. Plaintiff does not explain, however, why a statute which appears to have been designed to correct a particular problem must also provide for other merely potential problems. To the contrary, a remedial scheme will not be invalidated merely because it does not address every problem that might conceivably have been addressed. Chicago National League Ball Club, 108 Ill.2d at 367, 371, 91 Ill.Dec. 610, 483 N.E.2d at 1250, 1252. Similarly, plaintiff's citation to Best, 179 Ill.2d at 406, 228 Ill.Dec. 636, 689 N.E.2d at 1077, for the proposition that a legislative "one step at a time" approach has been disapproved by the supreme court is a mischaracterization, because, as the opinion makes clear, the "one step" rationale will be rejected as a basis for supporting a classification that is arbitrary. Because section 11.2(a)'s classification is not arbitrary, the principle has no application here.
Finally, plaintiff erroneously relies upon Louisiana and Missouri cases invalidating state statutes concerning riverboat gambling. In Louisiana Paddlewheels v. Louisiana Riverboat Gaming Comm'n, 646 So.2d 885, 889 (La.1994), the challenged statutes gave voters in two parishes far greater autonomy and control with regard to riverboat gaming than was afforded to the remaining parishes of the state, even though a number of parishes were directly affected by riverboat gaming on the Louisiana waterways. More specifically, the voters in Calcasieu and Ouachita Parishes were given extensive and ongoing control over gaming activities in their localities, while the remaining parishes could vote only to prohibit local riverboat gaming and had to exercise the right within eight months after the adoption of the challenged act. Louisiana Paddlewheels, 646 So.2d at 890. The court indicated the challenged statutes created a classification with a significant difference between the class created and the class excluded, and that there was no reasonable basis for designating the favored class for separate treatment. Louisiana Paddlewheels, 646 So.2d at 890. Although plaintiff contends the Illinois statute is analogous to Louisiana statute, in fact, it is not. There was a rational basis for giving different treatment to Illinois' ongoing and defunct gaming operations. The Missouri case, Harris v. Missouri Gaming Comm'n, 869 S.W.2d *1222 58 (Mo.1994), is even less pertinent. The court considered two laws exempting the riverboat casinos that were docked within a specific distance of the Eads Bridge in St. Louis and that had certain dimensions from laws requiring them to cruise and physically resemble historical boats. Harris, 869 S.W.2d at 65. Under Missouri law, the court started from the presumption that the new statutes were unconstitutional special laws, because the laws focused on specific immutable characteristics of geographic location and precise size. Harris, 869 S.W.2d at 65. Under Missouri law, the party defending a facially special statute bears the burden of demonstrating a substantial justification for the special treatment. Harris, 869 S.W.2d at 65. The case was remanded so that the defendant gaming commission could attempt to meet this burden. Harris, 869 S.W.2d at 66. The Missouri presumption of unconstitutionality is not pertinent here. Thus, plaintiff's discussion of these cases is unhelpful. The mere fact that other jurisdictions have found their specific riverboat gambling statutes to be unconstitutional does not warrant that this court do the same.
Our last consideration is defendants' contention that the Illinois Gaming Board should have been dismissed as a defendant (a) based on the doctrine of sovereign immunity, as described in Smith v. Jones, 113 Ill.2d 126, 100 Ill.Dec. 560, 497 N.E.2d 738 (1986), or (b) because section 11-301 of the Code of Civil Procedure permits actions to be brought against only state officers. See 735 ILCS 5/11-301 (West 2000) ("An action to restrain and enjoin the disbursement of public funds by any officer or officers of the State government may be maintained either by the Attorney General or by any citizen and taxpayer of the State"). In view of our determination that the challenged statute does not violate the prohibition on special legislation, it is not necessary to discuss the question of whether the Board itself, as opposed to the individual Board members, was a proper defendant to the action.
Affirmed.
O'MALLEY, P.J.[*] and McNULTY, J., concur.
NOTES
[*] After oral arguments in this case, Justice Gordon recused himself from further participation. Presiding Justice O'Malley was thereafter assigned to the panel. Presiding Justice O'Malley has read the briefs, listened to the tape of oral arguments, and otherwise participated in the decision-making process.